**VALEANT PHARMACEUTICALS INTERNATIONAL, Plaintiff,**

v.

**Adam JERNEY, Defendant.**

C.A. No. 19947.

Court of Chancery of Delaware, New Castle County.

Submitted: Dec. 1, 2006.

Decided: March 1, 2007.

Michael Hanrahan, Gary F. Traynor, Paul A. Fioravanti, Jr., Laina M. Herbert, Prickett, Jones & Elliott, P.A., Wilmington, DE, for the Plaintiff.

Jesse A. Finkelstein, Srinivas M. Raju, Brock E. Czeschin, Richards, Layton & Finger, P.A., Wilmington, DE; Pierce O'Donnell, O'Donnell & Associates, P.C., Los Angeles, CA, for the Defendant.

## OPINION

LAMB, Vice Chancellor.

In this post-trial opinion, the court renders judgment on the claims asserted against Adam Jerney, a former director and president of ICN Pharmaceuticals, Inc. (now known a Valeant Pharmaceuticals International). Jerney was sued, together with Milan Panic, ICN's former Chairman and CEO, and other members of the former ICN board of directors, for claims arising out of their unanimous collective decision to pay large cash bonuses to themselves and to certain other ICN executives and employees in connection with a later-aborted corporate restructuring. The litigation was initiated as a stockholder derivative action but, following a change in control of the board, a special litigation committee of the board of directors chose to realign the corporation as a plaintiff. As a result, with the approval of the court, the company took over control of the litigation. During the course of the discovery, the company reached settlement agreements with all of the non-manage-

ment directors, leaving Panic and Jerney as the only remaining defendants at the trial. After trial, the company reached a settlement agreement with Panic. Thus, the only claims now remaining are against Jerney.

The trial record leaves no doubt that the decision to pay cash bonuses was ill-advised and was not entirely fair to the company. The process pursued by the directors was deeply flawed with self-interest and no way substituted for arm's-length bargaining. It was also improperly dominated by Panic, who was the recipient of the largest portion of the money. Thus, there is nothing about the process that supports the fairness of the result. There is also little evidence to support the conclusion that, independent of the process, the price terms were somehow fair to the company. On the contrary, while the evidence suggests that some amount of bonus to the executives and employees might have been justified by past practices of the company, the extravagant payments actually made cannot be adjudged fair by any rational measure.

Jerney was not the motivating force behind this improper and self-interested scheme. Nevertheless, he voted as a director in favor of the plan and personally received $3 million. In the circumstances, Jerney will be required to disgorge the full amount of his bonus, plus interest, and will be held liable for additional damages flowing from his breach of the duty of loyalty in voting to approve the unfair, self-interested bonuses.

## I.

### A. *The Parties*

The plaintiff in this action is Valeant Pharmaceuticals International, a Delaware corporation with its principal executive of-fices in Costa Mesa, California. Valeant is engaged in the manufacture and marketing of pharmaceutical products worldwide. Valeant was known as ICN Pharmaceuticals, Inc. until November 11, 2003. To avoid confusion, the plaintiff will be referred to as ICN or the company in this opinion.

The sole remaining defendant is Adam Jerney. An ICN employee since 1973, Jerney rose through the ranks, eventually becoming President and Chief Operating Officer in 1993, positions he resigned on November 15, 2002. Jerney was also a director of the company from 1992 until May 2002.

### B. *The Facts* [1]

#### 1. *The History Of ICN*

The company was founded in 1959 by Panic as International Chemical and Nuclear Corporation. The company grew rapidly, amassing total sales of $100 million by 1970. In 1994, several related entities were merged to create ICN. For the end of fiscal year 2001, shortly before the culmination of the events at issue, ICN reported revenues of $858 million and operating income of $189 million. The company's market capitalization was roughly $2.6 billion.

By 2002, the most significant drug developed by ICN was the antiviral medication Ribavirin. Although first synthesized in 1971, Ribavirin did not receive FDA regulatory approval until 1994. The following year, ICN entered into a royalty agreement with Schering–Plough for the development and marketing of Ribavirin as a component in a combination therapy for Hepatitis C. In 1998, the FDA approved Ribavirin and Intron A as a combination therapy. By the end of 2001, Schering–

---

**1.** The court finds the following facts after trial on the merits.

Plough's sales of the combination therapy exceeded $1.5 billion. Sales of Ribavirin comprised a substantial part of ICN's revenues and represented roughly 60% of its overall value.

## 2. The Planned Restructuring

Despite the success of Ribavirin, activist stockholders led by Special Situations Partners ("SSP") questioned whether ICN's true value was being recognized by the market and urged the board of directors to consider splitting the company into parts. To an extent, this dissatisfaction grew out of public criticism of Panic's generous compensation and idiosyncratic management practices, as well as widespread criticism of the board's oversight. Despite Panic's reservations, ICN engaged UBS Warburg (then called Warburg, Dillon Read) to explore means of enhancing stockholder value. ICN also retained Fried, Frank, Harris, Shriver & Jacobson LLP as its legal counsel.

UBS's recommendation was to spin-off the Ribavirin rights and royalties under the agreement with Schering–Plough and related antiviral assets into a separate company, and then separate ICN's remaining U.S. and international businesses into separate entities. UBS suggested that the total market value of these three entities could exceed the total market value of ICN by $1 billion to $1.5 billion. Accordingly, on June 15, 2000, ICN announced a plan to restructure itself into three separate entities: ICN Americas, ICN International, and a new entity to be known as Ribapharm that would hold ICN's Ribavirin and related antiviral assets. The idea was for Ribapharm to be put together as a pure biotechnology company, resulting in a

stock attractive to investors who wanted a pure play investment in the biotechnology sector, and specifically Ribavirin.

## 3. The Development Of Ribapharm In Preparation For The IPO

The first step of the proposed restructuring was the IPO and spin-off of Ribapharm. To accomplish this, ICN created a new corporate entity and transferred to it the Schering–Plough royalties, the chemical compounds in ICN's library, as well as the personnel and assets at ICN's Costa Mesa facility. Over the next two years, ICN increased the research staff nearly tenfold and injected $28 million to modernize Ribapharm's facilities.

The issue of what role then current ICN management would play in Ribapharm proved troubling. Panic initially proposed to retain management control and play an active role in Ribapharm. That plan was later revised so that Panic would remain as Chairman and CEO of ICN Americas and become Chairman of both ICN International and Ribapharm. Jerney would become CEO of ICN International. SSP and others objected to even this reduced level of involvement by Panic in Ribapharm and threatened a proxy fight unless Panic, Jerney, and others agreed to cut all ties with Ribapharm at the time of the IPO. To avoid a proxy fight, ICN and Panic agreed that Panic and the other senior managers of ICN would have no executive or board positions with Ribapharm.[2] In return, SSP agreed not to nominate anyone for election at the 2000 annual meeting. SSP and other dissident stockholders did, however, run a competing slate at the 2001 annual meeting, on a platform that called for continued support

---

**2.** As part of the same agreement, ICN agreed with SSP to reduce the size of the board of directors to nine, to hold the 2001 and 2002 annual meetings of stockholders no later than

May 30, 2001 and May 29, 2002, respectively, and that, in total, no less than two-thirds of the directors would stand for election at those two meetings.

and acceleration of the Ribapharm IPO and spin-off. The dissident nominees easily defeated the management slate. Still, there was a considerable period of delay in accomplishing the Ribapharm IPO.

### 4. The IPO

UBS agreed to serve as lead underwriter of the Ribapharm IPO and, in December 2001, estimated the value of the company at around $2.25 billion. UBS also noted that the figure could rise to over $3 billion after several positive quarters. By this time, UBS estimated the IPO price in the range of $13 to $15 per share. Two unusual aspects of the Ribapharm IPO bear emphasis. First, the IPO was not for a new or emerging venture, but rather for the core of ICN's business. Second, although Ribapharm represented the majority of ICN's assets, ICN's existing senior management team would not take any role in the spun off entity. Together these factors, combined with the fact that it would be the second largest biotech IPO in the last twenty years, complicated the pricing and execution of the offering.

### 5. The IPO Is Repriced

In the late afternoon on April 11, 2002, the day before the IPO was scheduled to take place, UBS informed ICN that the IPO would have to be priced at $10 per share, not in the previously predicted $13 to $15 range. The reduction was attributable to a general downturn in the biotech sector, including the negative reaction of investors to another biotech IPO. The Dow also declined 200 points on that day.

Despite the large decrease in the offering price, the board decided to proceed with the transaction. In part, the board made this decision based on the advice of counsel. Fried Frank advised ICN that, with the downturn in biotechs, the IPO might not go forward at all if it was pulled since "pulling a public offering and repricing is like death to a public offering."[3] Thus, the IPO went forward at $10 per share. At that price, the total equity value of Ribapharm was only $1.5 billion, not the $2.25 billion earlier predicted. Nonetheless, the IPO was a success, and UBS exercised its "green shoe" over allotment options in the following weeks, resulting in total proceeds of $300 million in the IPO. Ribapharm's stock increased modestly in value following the IPO, despite unfavorable market conditions in the biotech sector.

### 6. The Disputed Bonuses

The record reflects that ICN management began planning a substantial grant of Ribapharm options as early as October 2000.[4] The first public disclosure of any similar plan came when Amendment 5 to the Ribapharm SEC Form S–1 was filed on March 21, 2002, disclosing an intention to award 8,350,000 Ribapharm options to Panic, Jerney, and others at ICN, including all of its outside directors, none of whom would serve any ongoing role in Ribapharm. Amendment 5 also reported the fair market value of the option grant as estimated at $53.7 million, assuming an IPO price of $14 per share. The majority of the options, 5 million, were to be granted to Panic. Jerney was to receive 500,000. The outside directors were each to receive 50,000 options.

---

**3.** Alexander Dep. 89:22–90–21.

**4.** In its October 31, 2000 draft Form S–1, there is disclosure of a plan to issue 3 million Ribapharm options to Panic, 500,000 to Jerney, and 1.5 million to other ICN officers who would not play a role at Ribapharm. Interestingly, this unfiled draft does not reflect any intention of awarding options to ICN's outside directors.

There was immediate and strong investor opposition to the proposed option grant. In addition to the objection that the options were wildly excessive and did not benefit Ribapharm going forward, the objecting stockholders also did not want Panic to have any ongoing control over Ribapharm. Panic's proposed 5 million options, if exercised, would give him voting control over a significant block of Ribapharm stock. This would be inconsistent with the dissident stockholders' desire to have Panic severed from Ribapharm entirely. Furthermore, the options themselves threatened substantial dilution of Ribapharm stock and would result in a significant noncash charge on Ribapharm's opening financial statements, concerns to all potential investors.

At the March 28, 2002 ICN board meeting, UBS reported to the directors that the option grant, specifically the proposed 5 million option allocation to Panic, threatened the success of the IPO. In an effort to save the planned option grants, Panic suggested that the matter be referred to the compensation committee. The compensation committee met five times in the following days to discuss the bonuses. At its final pre-IPO meeting, on April 10, 2002, the committee first confirmed its support for the option grant program but suggested as an alternative to recommend that the full board authorize the payment of $55 million in cash, in proportion to the planned option awards.

### 7. *The Compensation Committee Process*

The compensation committee consisted of three directors: Stephen Moses, Rose-mary Tomich, and Norman Barker, the chairperson. As directors, each was slated to receive 50,000 Ribapharm options under the option grant plan, or the cash equivalent of $330,500 under the substituted cash bonus plan. Thus, the compensation committee members were clearly and substantially interested in the transaction they were asked to consider.

The record reflects that at least two of the committee members were acting in circumstances which raise questions as to their independence from Panic. Tomich and Moses had been close personal friends with Panic for decades. Both were in the process of negotiating with Panic about lucrative consulting deals to follow the completion of their board service.[5] Additionally, Moses, who played a key role in the committee assignment to consider the grant of 5 million options to Panic, had on many separate occasions directly requested stock options for himself from Panic.

The process the committee followed was equally subject to the influence of Panic and other members of ICN's management and became little more than an exercise in discovering an adequate justification for the options issuance plan.[6] For example, the committee did not select its own independent compensation consultant. Rather, the committee was "directed by the board to seek out Towers Perrin to do this for us."[7] Moreover, the committee does not appear to have known that Towers Perrin had been brought into the matter months earlier by Gregory Keever, ICN's general counsel. According to an internal UBS email, Keever told UBS before March 27, 2002 that "Towers Perrin had looked specifically at this issue and determined it was

---

**5.** Moses and Tomich eventually received those consulting agreements in June of 2002.

**6.** Moses testified that the committee began by examining whether any award was justified, but this testimony finds no support in the minutes of the committee meetings or the other evidence.

**7.** Tomich Dep. 43:23–44:6.

justified in this instance." [8] Keever, like all senior ICN executives, had a large personal stake in the outcome of the committee's work, as he was slated to receive 350,000 options worth $2.3 million under the grant. It is noteworthy that while ICN's outside counsel played little role in the compensation committee's work, Keever attended all of its meetings and acted as its secretary.

### 8. The Towers Perrin Report

On April 9, 2002, Kenneth Troy delivered the Towers Perrin report to the compensation committee. The parties characterize the substance of the report in dramatically different ways. Jerney relies on the report for the proposition that the bonuses were fair. The plaintiff, in addition to noting the conflicted and tainted process, argues that the report supports an irrefutable conclusion that the bonuses were unprecedented and excessive. The report contains no comparable transactions where officers and directors received bonuses in connection with a transaction of this type.

The Towers Perrin report does illustrate a situation where bonuses were awarded in connection with the spin-off of a newly developed entity. These incubator IPO situations occur when existing management develops a new line of business and, in connection with the IPO of that business, management is granted bonuses. Unlike the present case, these situations occur when a subsidiary business, not the main business, is spun off from a company. Similar situations can also occur when the entire business of a company is taken public through an IPO, a so-called success fee. In incubator IPOs, the bonuses are usually in cash paid by the parent company. Here, the initial bonus proposal was for options in the entity to be spun off.

The report concludes that the $53.7 million value of the options was a reasonable estimate and was comparable to a 2% management success fee in commensurate incubator IPO situations. Thus, while Towers Perrin found no comparable transactions, its report opines the option bonuses were justifiable at the level proposed. Specifically, the report indicates that the compensation committee could award Panic up to 5 million options as a bonus based on an estimated value of Ribapharm of $3 billion. This award was purportedly in return for the contributions Panic made in the development of the Ribapharm assets.[9]

The Towers Perrin report also reviewed past compensation practices of the company. The report concludes that the compensation for the company's executives, specifically Panic, was within the median range of similarly situated executives. However, the report did not consider Panic's recently amended compensation agreements. The report also did not consider certain other recent compensation studies performed for ICN. These studies, relied on by the plaintiff, indicate Panic's total direct compensation was 27% higher than the 75th percentile and 51% higher than the median among CEOs in ICN's peer group. The Towers Perrin report does discuss the fact, emphasized by Panic to

---

8. PX 247.

9. Interestingly, an April 5, 2002 discussion draft of the Towers Perrin report, apparently shared with management but not with the compensation committee, suggested a reduction in the proposed grant to Panic from 5 million to 3 million options. This suggestion led to a meeting between Troy and Panic, at which Panic described his contributions to the success of ICN and Ribavirin, in particular. The final Towers Perrin report supports an award to Panic at the 5 million option level.

Troy, that ICN had paid event-driven success bonuses in the past.

### 9. *The Shift From Options To Cash*

The Towers Perrin report not only omits any opinion on cash bonuses, but is expressly limited to a consideration of the option bonuses proposal, although the report suggests that cash was the more common bonus medium in other transactions. The concept of switching to a cash bonus scheme was initially considered during the April 10, 2002 compensation committee meeting. The meeting lasted only fifteen to twenty minutes. Based on the evidence presented at trial, it is clear that the committee hurriedly decided to propose a cash bonus as an alternative for the board to consider along with the option bonus plan and decided that $55 million, the midpoint of the option value range recommended by Towers Perrin, was the proper amount.

The decision to convert to cash was not initiated by management and was, in fact, resisted by Panic, who wanted options. The switch from options to cash was simply a necessary accommodation to rebellious investors, in order to keep the IPO on track. By switching from options to cash, the cost was shifted entirely to ICN, which had ample cash. This removed a sizeable expense from the Ribapharm opening financial statements. Moreover, both the overhang of options at Ribapharm and Panic's potential interest in Ribapharm were dramatically reduced.

The suggestion to pay $55 million in bonuses was based upon the erroneous assumption of a $3 billion valuation of Ribapharm. Panic tried to push the measure past the board. Although one of the directors (elected in 2001 on the dissident slate) at first proposed limiting the bonus pool to $10 million, the board agreed to reduce the bonus pool only slightly to $50 million. The board then unanimously approved the cash bonus pool of $50 million to be allocated in proportion to the previously proposed option grants. The board referred the matter to the compensation committee to implement the conversion to cash.

The next day, UBS told ICN that the IPO would have to be repriced to $10 per share. Panic was advised by two Fried Frank lawyers to have the board revisit the bonus scheme authorization in light of the change in pricing. Panic ignored this advice. Although the board met to authorize the IPO pricing, it never reconsidered the amount of the bonus award.

Working in consultation with Moses, who acted in lieu of the compensation committee, Panic later reallocated the bonuses, increasing his and those of a few others, and reducing or eliminating a few.[10] In the end, Panic took $33,050,000, up from $29,950,000. Jerney's bonus was cut by $305,000 to $3,000,000. As part of this reallocation, the total bonus pool decreased slightly from $50 million to $47.8 million. Each of the outside directors received $330,500.

### 10. *Events Following The IPO*

ICN always intended to follow the IPO with a second step, *i.e.* the tax-free spin-off of the rest of Ribapharm. The only condition precedent to this event was the receipt of a favorable tax ruling from the Internal Revenue Service.[11] Before that ruling was received, a second group of dissident directors was elected, in large part in reaction to the size of the bonuses. Panic resigned shortly thereafter. Jer-

---

10. The company subsequently settled and lost in arbitration to some of those whose bonuses were reduced.

11. This ruling was issued on July 24, 2002.

ney's term as a director expired in May 2002 and he resigned as president in November 2002.

In a strange twist, the reconstituted board, including both the 2001 and the 2002 dissidents who ran on platforms promising to move forward promptly with the IPO and the spin-off, decided to abandon the spin-off. This decision led to litigation by the persons who bought Ribapharm in the IPO. Eventually, ICN repurchased the outstanding shares of Ribapharm through a $6.25 per share tender offer.[12] Following the Panic management team's departure, the company suffered three straight years of net losses and a dramatic decline in its stock price.

## C. *Expert Testimony At Trial*

### 1. *Jerney's Experts*

Two experts testified on behalf of Jerney and Panic about the fairness of the bonuses. Anne T. Kavanagh, a consultant with a background in capital markets and investment banking, testified about the structure of the transaction and the decisions of the board in light of the changes in circumstances throughout the process. She opined that the $13 to $15 range of price of the IPO was reasonable when predicted and that the board had no reason to know that the IPO would not be priced within that range. She further opined that the decision to go forward with the IPO after UBS reported that the price would have to be reduced to $10 was prudent. Moreover, she maintained that the switch from options to cash was reasonable given the market pressures and that the board had no reason to believe the spin-off would not occur. Finally, she expressed

her view that the IPO was a success for Ribapharm. The court largely agrees with these opinions and does not further discuss them here.

Kavanagh rendered several additional, more controversial opinions. First, Kavanagh testified that the amount of the bonuses was appropriate when measured against the options award in new technology development cases. Second, she opined that it would not have been possible for the board to materially alter the cash bonuses in response to the reduction in the pricing of the IPO. Third, she opined that Panic should be considered a "restructuring expert" and was, therefore, compensated appropriately based in that role.

Jerney's other expert, Richard H. Wagner, is the President of Strategic Compensation Research Associates, a small advisory firm located in West Chester, Pennsylvania. Wagner's report, like Kavanagh's, attempts to provide support for the fairness of switching from options to cash, not reducing the total bonus pool in light of the IPO repricing, and the allocation of the bonuses. He also shares Kavanagh's view that Panic could have been considered a restructuring expert. In opining that the bonuses were fair and justified, Wagner points out that even the dissident stockholders believed that the IPO and spin-off would increase stockholder value by up to 50%. Wagner also asserts that there was uncertainty as to whether Jerney's existing ICN options would be adjusted in connection with the IPO and spin-off and, in that connection, opines the company would benefit by awarding the bonuses in lieu of paying the existing options.

---

**12.** The tender offer led to a suit in this court that resulted in a class action settlement releasing all claims, including the decision not to pursue the spin-off of ICN's interest in Ribapharm. *See In re Ribapharm, Inc. S'holder Litig.,* C.A. Nos. 20337, 20387 (Dec. 2, 2004) (Order).

## 2. The Company's Expert

The company offered George B. Paulin as an expert to refute the opinions offered by Kavanagh and Wagner. Paulin is the President and CEO of Frederic W. Cook & Co., Inc., and specializes in the areas of executive and employee compensation. Paulin's report focuses on the competitive reasonableness and business rationale for the bonuses. He opines that in an IPO/spin-off as opposed to a merger, acquisition, or divestiture, bonuses are uncommon and have no business justification. This, he says, is because in an IPO or spin-off the stockholders of the parent corporation continue to hold the exact same assets as before the transaction. In examining 36 comparable transactions, Paulin found only nine where special compensation was paid to officers. In the largest comparable transaction, the Park Place Entertainment/Hilton Hotels transaction, Hilton's CEO received stock options in the parent company valued at $26.3 million or 1.24% of the new company's value. The 75th percentile of the nine transactions where special compensation was paid was .371% of the value of new company transaction, well below the 2.2% in bonuses awarded to Panic alone in the present case. Paulin's report goes on to discuss the relative historical level of ICN's executive compensation, concluding it was well above the median for all relevant time periods.

## 3. The Court's Conclusions Regarding The Expert Testimony

Having considered the testimony, the initial expert reports, and the rebuttal reports of Paulin and Wagner, the court concludes that, while the decisions of the board to convert the options to cash and to proceed with the IPO might have been reasonable given the circumstances, the underlying decision to grant bonuses and the determination of the bonus amounts was flawed. The views of Jerney's experts do not undercut this conclusion. For example, Wagner maintains that Jerney and Panic were underpaid based on comparable executives.[13] Paulin's rebuttal report demonstrates that this is simply not true.[14]

The court is also unable to credit Wagner's suggestion that Panic or Jerney would have suffered some dilution of their existing ICN stock options in the spin-off or that the company stood to "benefit by awarding bonuses in lieu of 'spin-off' options."[15] Nothing in the record supports these opinions. Indeed, Paulin's rebuttal report demonstrates the opposite is true, citing an Internal Revenue Code formula requiring an automatic adjustment of options. If there was some evidence that Jerney contractually agreed to relinquish his existing options in exchange for the IPO cash bonus, Wagner's opinion might be tenable. There is not, and without such evidence Wagner's opinion is mere conjecture.

The court also rejects Wagner's and Kavanagh's view that Panic and Jerney should have been considered "restructuring experts" and should have been compensated as such. Overseeing the IPO and spin-off were clearly part of the job of

**13.** DX 428 at 4–5 ("Over the period 1995 through 2001 ... such cash compensation was in the middle of the pack [and] the non-cash compensation paid to Messrs. Panic and Jerney throughout this period was also in the middle of the pack.").

**14.** JX 352 at 6 ("Salary and bonus is not total compensation. Mr. Panic's total compensa-tion exceeded the 75th percentile for peer companies when the annualized grant-value of his stock options is taken into account. Mr. Jerney's total compensation exceed the median for peer companies but fell moderately short of the 75th percentile.").

**15.** DX 428 at 10.

the executives at the company. This is in clear contrast to an outside restructuring expert who is hired for a brief time to supervise the restructuring of a company. In fact, the company retained and paid UBS in large part to provide advice and guidance throughout the restructuring, much as a designated restructuring expert would do.

In the end, what is noticeably absent from both the Wagner and Kavanagh expert reports is any comparable transaction that would justify the award of such large bonuses. Wagner's report attempts to distinguish the Ribapharm transaction as unique and therefore justifying the bonuses. While undoubtedly unusual, nothing that distinguishes the Ribapharm IPO can be thought to have justified such a large bonus pool. On the contrary, the key distinctions—that the spin-off was of the one major asset of the company, the fact that existing management would not have a role in the spun off entity, and the overestimation of the value of Ribapharm in the projected pricing of the IPO—all cut *against* the award of large bonuses.

## II.

Jerney takes the position that the bonus payments were entirely fair and "embraces" his burden to prove entire fairness. He emphasizes that both he and Panic were largely responsible for the development of Ribapharm and the long-term success of ICN and that the IPO was among the most significant events in the company's history. Therefore, Jerney asserts, while the process employed may not have been perfect, it was fair and appropriate in the circumstances, and the level of bonuses was justified.

Jerney maintains that the fair dealing prong of entire fairness was satisfied at trial. He characterizes the process employed as deliberative and one involving spirited discussions among the participants over the size and nature of the bonus grants. In further defending the process, Jerney points to the advice from Towers Perrin, UBS, and the company's legal advisors. He also asserts that the board was relying on the advice of expert advisors. That advice, he says, insulates the board because both the idea for bonuses and the amount of the bonuses were proposed by UBS and the bonuses were approved by Towers Perrin. Jerney also points to the legal advice of Keever and Fried Frank, who he says made him "very comfortable in terms of the process."[16] He stands behind his reliance on lawyers from Fried Frank, who he maintains never said the process was improper or that the bonuses should be lowered.

It is the second prong of the entire fairness test, fair price, where Jerney directs the most attention. As a threshold matter, Jerney focuses his fair price analysis on the role of experts in the transaction. To substantiate his two key points—that a bonus was merited and the amounts were appropriate—Jerney makes three principal arguments. First, he says, the awards, and particularly the size of the awards, were appropriate under ICN's "event bonus" policy.[17] This unique compensation structure, he argues, is permitted under Delaware law and the extraordinary nature of the event justified the bonuses under ICN's policy. The crux of Jerney's position is that while the bonuses may not be appropriate for other companies, they were appropriate in ICN's circumstances and under ICN's system. Moreover, he maintains, the great success

---

**16.** Jerney 645:18–24.

**17.** Def.'s Post-trial Br. 41.

of the Ribapharm assets were not the subject of an event bonus prior to the IPO, even though a bonus was clearly merited. Next, Jerney argues that the bonuses were appropriate because of the extraordinary role he and Panic played in the development of ICN and Ribapharm. Finally, Jerney argues that the testimony of his expert, Wagner, and, perhaps more importantly, the compensation provided to the company's new management, proves the level of the bonuses was fair.

Alternatively, Jerney argues that, even if this court concludes the transaction was not entirely fair, the court should use its equitable powers to reduce, rather than eliminate entirely, the bonus paid to him. He maintains that he is entitled to a very substantial sum under ICN's event bonus policy, and to deprive him of that would be "reverse unjust enrichment."[18] Therefore, in the alternative, Jerney argues this court should merely reform downward the amount of the challenged awards to an equitable level.

The company counters that the transaction was not entirely fair because the transaction was the result of a fatally flawed, entirely self-interested process that ended with grossly excessive bonuses when no bonuses should have been awarded at all. The company maintains that the process used to approve the transaction was dominated by management. Moreover, it says, the process employed was designed to justify management's preconceived bonus plan. Finally, ICN argues that Jerney's reliance on experts, both legal and compensation, does not provide a defense.

## III.

Before the 1967 enactment of 8 *Del. C.* § 144, a corporation's stockholders had the right to nullify an interested transaction.[19] To ameliorate this potentially harsh result, section 144 as presently enacted provides three safe harbors to prevent nullification of potentially beneficial transactions simply because of director self-interest. First, section 144 allows a committee of disinterested directors to approve a transaction and, at least potentially, bring it within the scope of the business judgment rule.[20] Second, the transaction may be ratified by a fully informed majority vote of the disinterested stockholders.[21] Finally, the challenged transaction can be subjected to post-hoc judicial review for entire fairness.[22]

■ As Jerney concedes, this is clearly a situation where entire fairness review is applicable. Where the self-compensation involves directors or officers paying themselves bonuses, the court is particularly cognizant to the need for careful scrutiny.[23] Self-interested compensation decisions made without independent protections are subject to the same entire fairness review as any other interested transaction.[24] To

---

18. *Id.* at 48–49 (*citing Technicorp Intern. II, Inc. v. Johnston*, 2000 WL 713750, at *52).

19. *Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991) (*citing Potter v. Sanitary Co. of Am.*, 194 A. 87 (Del.Ch.1937)).

20. 8 *Del. C.* § 144(a)(1).

21. *Id.* at (a)(2).

22. *Id.*

23. *Delta Star, Inc. v. Patton*, 76 F.Supp.2d 617, 633 (W.D.Pa.1999).

24. *Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del.2002) (holding "directoral self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation").

avoid this high level of judicial scrutiny, an independent compensation committee can be employed to award salaries and bonuses to officers.[25] In this case, because no independent committee approved the transaction, Jerney bears the burden of proving the transaction was entirely fair.[26]

■ Directors who stand on both sides of a transaction have "the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." [27] Entire fairness can be proved only where the directors "demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." [28] Entire fairness has two components: fair dealing and fair price.[29] The two components of the entire fairness concept are not independent, but rather the fair dealing prong informs the court as to the fairness of the price obtained through that process. The court does not focus on the components individually, but determines entire fairness based on all aspects of the entire transaction. Fair dealing addresses the "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." [30] Fair price assures the transaction was substantively fair by examining "the economic and financial considerations." [31]

## IV.

### A. *Fair Dealing*

■ It is clear that despite some superficial indicia of a fair process, the bonus transaction was the product of unfair dealing by Panic, Jerney, and the other interested parties. This underlying reality permeated every aspect of the process, one that was, from the outset, undertaken to justify a bonus on the order of $30 million to Panic, rather than determine if bonuses—and in what amounts—might be appropriate.

The origin of the present bonus scheme was the initial recommendation by UBS to spin-off the Ribapharm assets. UBS suggested that, in connection with the spin-off, bonuses would be appropriate. The seed of that suggestion fell on fertile ground. Throughout the process and the unforeseen events that occurred, neither Panic, nor ICN management, nor its board deviated substantially from this idea and, in fact, increased the amount of the bonuses to be awarded.

#### 1. *Panic Domination Of The Process*

The entire process from the initial idea of awarding bonuses to the final reallocation of the bonus pool was dominated by Panic. The first reference to bonuses produced at trial, an October 2000 draft of ICN's Form S–1, indicated a bonus pool of 5 million options, 3 million of which were to be allocated to Panic. Without board involvement, Panic and management increased Panic's option allocation to 5 million and added additional bonuses for every director. Even other employees such as Jerney's and Panic's secretaries and support staff were included in the

---

25. *Merritt v. Colonial Foods, Inc.,* 505 A.2d 757, 764 (Del.Ch.1986).

26. *Id.*

27. *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del.1983).

28. *Id.*

29. *Id.* at 711.

30. *Id.*

31. *Id.*

scheme.[32] Thus, the idea that there would be a bonus pool in the $50+ million value range in the structure proposed by Panic was clearly established and even disclosed in Ribapharm's March 2002 Form S–1 filing, before the board took any action or even considered the matter.

The first evidence of board involvement came after Amendment 5 to the Ribapharm Form S–1 on March 21, 2002, when, in response to a firestorm of criticism from investors, Panic agreed that the board should refer the matter to the compensation committee. All three members of that committee were, themselves, interested in the proposal. Moreover, two of the committee members, Moses and Tomich, appear to have lacked independence from Panic resulting from, among other things, their undisclosed negotiations with Panic over future consulting agreements and, in the case of Moses, separate option grants.

Nor did the committee act independently. Rather, it retained Towers Perrin as its advisor at the direction of management, perhaps without the knowledge that Towers Perrin had already given advice to management on the bonus proposal. At first, Troy struggled to "come up with a framework that made sense."[33] As he further explained his analysis of the proposed option grant:

> [W]e did come to the conclusion that it was unprecedented in its form, that you would give options in the spun entity to parent company execs that would have no involvement with the ongoing enterprise. That was unprecedented.[34]

This lack of precedent caused Troy and Towers Perrin to suggest that Panic's option grant be cut down from 5 million to 3 million. Troy testified that he made this proposal in a presentation to the committee on April 5. Troy was then asked to speak to Panic, who explained to Troy that he "was looking for ... support of this grant as being reasonable based on his role in creating this product and business."[35] By the end of the meeting, Troy understood that the proposal was the one Panic had negotiated (with UBS or unknown others), that it was predetermined, and that Towers Perrin's job was to find a rationale to support it. The final Towers Perrin report, produced a few days later, omitted any suggestion of cutting Panic's allocation and, instead, supported the full 5 million option award for him.

It is also the case that the information provided to Towers Perrin was controlled by management and skewed the results of the analysis. For example, Towers Perrin used the $2.5 billion to $3 billion valuation given to it by management when (i) the actual anticipated value of the IPO was lower and (ii) the expected incremental value resulting to the entire enterprise from the IPO and spin-off was even less. Using the mid-range of this exaggerated valuation and an assumption that a 2% success bonus was justified, Towers Perrin derived a total bonus pool of $55 million. As Troy recognized, this level of bonus was unprecedented and difficult to justify, even assuming an unrealistically high value range.

A review of the compensation committee meeting minutes confirms the court's conclusion from the other evidence that the process the committee followed was one designed simply to justify a predetermined outcome dictated by Panic and ICN's management. The committee did not examine afresh the question of whether any bonus

32. JX 3, 5, 6, 55.

33. Troy Dep. 47.

34. *Id.*

35. *Id.* at 49.

arrangement was appropriate and, if so, how much and what form of bonus to award. This can be seen in the April 2 meeting minutes where the committee began their consideration by discussing "[t]he question of what rationale is appropriate to support the award...."[36] The other minutes are replete with suggestions by Moses, in particular, of possible explanations both for awarding sizeable bonuses and for paying a large portion of any award to Panic.[37]

### 2. The Process Was Unfair

In addressing "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained," it is clear Jerney has not met his burden. The transaction was initiated by management. It was structured so that everyone, including even the board members and the members of the compensation committee, would receive a bonus. The structure was not negotiated. Everyone involved had an interest in the transaction. The few who opposed it achieved only minor concessions and still voted in favor of it and accepted their shares. Finally, and perhaps most perniciously, the board, the

compensation committee, and outside experts were given and relied on inflated and misleading information provided by management led by a recalcitrant CEO who stood to benefit most from the transaction. Therefore, the court cannot conclude that Jerney has carried his burden of proving that the process of awarding the bonuses was entirely fair. It simply cannot be said that an independent board advised by independent experts would have employed a similar process in negotiating or approving bonuses of this kind.

### B. Fair Price

The court's finding that ICN's management and board used an unfair process to authorize the bonuses does not end the court's inquiry because it is possible that the pricing terms were so fair as to render the transaction entirely fair.[38] Nevertheless, where the pricing terms of a transaction that is the product of an unfair process cannot be justified by reference to reliable markets or by comparison to substantial and dependable precedent transactions, the burden of persuading the court of the fairness of the terms will be exceptionally difficult. Relatedly, where an entire fairness review is required in such a case of pricing terms that, if negotiated

---

**36.** JX 38 at 1.

**37.** The company attempts to convince the court that the defendants and the other interested directors drove the idea of changing the bonuses from options to cash, thereby enriching themselves without the commensurate risk of options. The evidence does not support this conclusion. The trial testimony demonstrated that both Jerney and Panic opposed the change to cash and would have far preferred to receive options. It is true that, by agreeing to take cash and by refusing to adjust the amount of cash when the IPO was priced at $10, instead of $13 to $15, Jerney, Panic and the others received greater value than they would have received under the option award plan. This is true because the

options would have been granted at the $10 per share IPO price and would immediately have been worth less than the cash payments that were calculated as if the IPO took place at $14 per share. In addition, when ICN ultimately repurchased the Ribapharm shares, Ribapharm options were simply canceled. Thus, Panic and Jerney would likely have ended up with valueless options. Nevertheless, the evidence does not support the conclusion that Panic or Jerney drove the decision to pay cash. On the contrary, the conversion to cash marks the one instance where management's domination of the process was not complete.

**38.** Oliver v. Boston Univ., 2006 WL 1064169, at *25 (Del.Ch. Apr. 14, 2006).

and approved at arm's-length, would involve a broad exercise of discretion or judgment by the directors, common sense suggests that proof of fair price will generally require a showing that the terms of the transaction fit comfortably within the narrow range of that discretion, not at its outer boundaries.

### 1. Bonuses Under ICN's Event Bonus Policy

■ The first step in the fair price analysis is to determine whether any bonus was justified. The evidence at trial showed that, under ICN's event bonus policy, management did occasionally receive bonuses in connection with extraordinary transactions. The policy is theoretically permissible under Delaware law, even though such bonuses could be viewed as compensation for past services.[39] Event bonuses were paid on at least two prior occasions—the agreement with Schering–Plough to license Ribiviran and ICN's issuance of $525 million in debentures. The IPO and planned spin-off were extraordinary events and, therefore, some form of bonus might have been possible under that policy.[40]

Nevertheless, the court cannot find that ICN's event bonus policy justified paying such substantial additional bonus compensation to ICN management based solely on the development of Ribapharm as a stand-alone entity. Clearly, Panic, Jerney, and the other members of management were well compensated for their work at ICN, work that included the development of the assets that were transferred to Ribapharm. Additionally, the previous event bonuses for the Schering–Plough license agreement and the debt issuance were directly related to the development of the Ribapharm assets. Further, annual bonuses were paid, at least in part, in recognition of the success of Ribavirin and the FDA approval of the drug. Ribavirin was the primary asset of ICN, and it is nonsensical to conclude that the past compensation of ICN's management was not reflective of its development. Thus, while some bonus might have been appropriate, the amount of the bonus should have been calculated with reference to the value added to ICN by the IPO and spin-off and not the total value of Ribavirin or other assets contributed by ICN to Ribapharm.

---

**39.** *See Steiner v. Meyerson*, 1995 WL 441999, at *7 (Del.Ch. July 19, 1995) ("[T]here is, of course, no single template for how corporations should be governed and no single compensation scheme for corporate directors.").

**40.** The company maintains that, even if ICN had a valid event-based bonus policy, the bonuses paid here were unwarranted for two other non-price reasons. First, it argues that no comparable transactions were adduced at trial. Second, it argues that, since the bonuses were based on some assumed value of the IPO and the spin-off, no payments should have been made before the spin-off occurred.

While it is true that no directly comparable transactions were found, the transactions the defendants did elicit were similar enough for the court to conclude that some bonus was possible here. If, as all parties seem to agree, the IPO and spin-off were designed to increase ICN's overall market value and benefit stockholders, such an increase in market value could merit a bonus under the company's idiosyncratic event bonus policy.

The company's second argument, that the bonuses should have been paid with the spin-off, also comes up short. The evidence at trial showed that everyone involved assumed that the spin-off would inevitably occur: it was required under the terms of the deal ICN made with SSP in 2000, and management and the board were committed to it. Thus, at the time the decision was made, there was nothing inherently improper in paying the bonuses upon the receipt of the proceeds from the IPO. There was evidence at trial that bonuses are sometimes paid at the time of the spin-off. But the court is not convinced that this should be a hard and fast rule.

### 2. The Bonuses Were Based On An Inflated Valuation Of Ribapharm

Were it proper to base the bonuses on the total value of Ribapharm, the record reflects that the size of the bonus was calculated as 2% of an unrealistic and inflated $2.5 billion to $3 billion value. This range was taken from the high end of UBS's projected total value estimate. But this value was not UBS's projected starting value for Ribapharm. Instead, it is a potential value that 'might be achieved after a period of positive results. The initial predicted value of Ribapharm was only $2.25 billion, even assuming a $14 per share IPO price, or approximately 20% lower than the value used in determining the amount of the bonuses. This fact alone makes the amount of the bonuses not entirely fair.

More importantly, the premise that the bonuses should have amounted to 2% of the total value of the spin-off was unreasonable. Towers Perrin opined that a 2% award might be appropriate in a smaller transaction, such as an incubator IPO or spin-off of a small division of a larger company. But ICN was spinning off its most valuable asset. Thus, the bonuses were awarded essentially for taking the biggest piece of an already public company and reissuing it as a new public stock. Moreover, the bonuses in question were being paid to parent company managers who would have no further involvement in the "spun" company. When viewed from this perspective, it is difficult to see how such large bonuses could be justified. Thus, it is not surprising that Towers Perrin was unable to find comparable grant data.

### 3. Adjustment To The Bonuses When The IPO Was Repriced

Even if the court assumes the propriety of paying an event bonus based on the IPO and spin-off, the substantial reduction in the IPO price demanded a reduction in any bonus award. When the compensation committee and the board approved the bonuses, they did so with the understanding that the IPO would be priced at $13 to $15 per share. When the IPO pricing was reduced to only $10 per share a day later, lawyers from Fried Frank advised Panic that the board should consider reducing the bonus amount in light of that new information. Panic ignored that advice. He and the compensation committee (principally, Moses) did adjust the bonus schedule, but this was done merely to favor some employees, especially Panic, and disfavor others. The net amount of the bonuses was reduced slightly, and this outcome was unrelated to and not reflective of the decrease in the IPO pricing. Thus, even assuming the propriety of the rationale used to award these bonuses, the amount of the bonuses cannot be regarded as entirely fair.

### 4. The Price Was Unfair

Considering all of the evidence, the court must conclude that Jerney has failed to show the fairness of the price terms of the bonus grants. The price terms obviously cannot be justified by reference to any reliable market. Nor is there proof in the record of substantial comparable transactions to which the court might look to find support for the payment of bonuses of this size. Moreover, although the award of bonuses was certainly a discretionary action, as opposed to one required by contract or statute, it can hardly be said that the board's decision was the result of a limited or narrow exercise of its powers. Indeed, the record at trial did nothing to dispel the impression that the amount of the bonuses paid was grossly excessive.

### C. No Advice Of Experts Defense Is Available

 Jerney argues that his good faith reliance on the advice of experts pro-

vides a defense, citing 8 *Del. C.* § 141(e). Although "reasonable reliance on expert counsel is a pertinent *factor* in evaluating whether corporate directors have met a standard of fairness in their dealings with respect to corporate powers," its existence is not outcome determinative of entire fairness.[41] To hold otherwise would replace this court's role in determining entire fairness under 8 *Del. C.* § 144 with that of various experts hired to give advice to the directors in connection with the challenged transaction, creating a conflict between sections 141(e) and 144 of the Delaware General Corporation Law. To illustrate the point, Jerney can point to no case where any court has held that section 141(e) provides a defense in an entire fairness action. This is particularly true where the person claiming the defense, like Jerney, is interested in the challenged transaction.[42]

Jerney's claimed defense also finds little or no support in the record. While there is conflicting evidence as to whether the Fried Frank lawyers advised the directors that the entire fairness standard would apply, there is no credible evidence that the board was ever told by them that the transaction was fair or that the business judgment rule would operate. On the contrary, although the court has no need to resolve the disputed record, there is ample reason to conclude that outside legal counsel, in fact, advised the directors that the transaction was subject to entire fairness and might not be found to be entirely fair. Beyond giving such advise, it was not within the expertise of Fried Frank or any other independent counsel to opine as to the actual substantive fairness of the proposal.

Any attempt to rely on the Towers Perrin report encounters similar factual problems. First, the directors retained Towers Perrin at the direction of management and failed to ask Troy about his earlier work related to this same issue. Substantively, the Towers Perrin report addresses the earlier proposal for Ribapharm to award options, and expressly limits its advice to that issue. Moreover, the advice given in the Towers Perrin report was predicated on substantially inflated values for both the IPO pricing and the net benefit of the IPO and spin-off to ICN. Therefore, it would have been unreasonable for Jerney to rely on that report as an expert opinion as to the fairness of ICN's payment of $50 million in cash bonuses.

## V.

The company seeks the following recovery from Jerney: (1) his $3 million bonus; (2) the $3.75 million advanced on his behalf for attorneys' fees and expenses incurred in connection with his defense; (3) his one-eleventh pro rata share, or $755,396.36, of the bonuses paid to non-directors; and (4) his one-eleventh pro rata share, or $72,349.96, of the fees and expenses of the special litigation committee.[43] The company could have sought a greater recovery from Jerney, including damages flowing from the payment of Panic's $33 million bonus. Nevertheless, having settled its claims against all other defendants, the company has chosen to limit its claim against Jerney as noted.

Jerney advances several arguments to reduce the amount of damages for which

**41.** *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1134, 1142 (Del.Ch.1994), *aff'd,* 663 A.2d 1156 (Del.1995) (emphasis added).

**42.** *Boyer v. Wilmington Materials, Inc.,* 754 A.2d 881, 910 (Del.Ch.1999).

**43.** Hereinafter referred to as "categories" 1 through 4.

he is liable.[44] First, regarding his bonus, Jerney argues that it is in the discretion of the court to award either money damages or disgorgement, and, in exercising that discretion, the court should award only money damages and only to the extent that the bonus was unfair. In addition, Jerney points out that three of the settling directors executed joint tortfeasor releases that included the company's claim against them to recover Jerney's bonus, thus reducing Jerney's liability for his bonus proportionately. Finally, Jerney argues that, in determining his pro rata share of damages in categories 3 and 4 above, the proper number to use as the denominator is the full twelve member board, not just the eleven who attended the meeting and voted on the bonuses.

■■■ The court begins with the observation that there are two distinct sources for an award of damages in the case of an unfair self-dealing transaction. First, such a transaction is voidable as between the parties to the transaction. Second, the underlying breach of the fiduciary duty of loyalty may give rise to other damages.[45] In this case, the disgorgement obligation most clearly applies to the $3 million bonus paid by the company to Jerney as part of the voidable transaction. The second source of liability more generally governs Jerney's liability for damages for the bonuses paid to others, such as non-directors, and to incidental damages incurred by the corporation, such as the costs of the special litigation committee's investigation into the charges leveled against him and others in the initial derivative complaint. In addition, Jerney's liability to repay amounts advanced to him for his defense in this matter arises under the corporation's certificate of incorporation and his contractual undertaking.

## A. Recovery Of The Bonus

■■■ Because Jerney has failed to show that the transaction was entirely fair, it is clear that he has no right to retain any of the $3 million bonus he received. As between Jerney and the company, that payment must be rescinded, requiring Jerney to disgorge the full amount.[46] Jerney's liability in this regard will not be limited to the excess of what the court might conclude was a "fair" bonus.[47] There is also no suggestion that the corporation has been made whole as a

---

44. Through the process of supplemental briefing, the company eliminated some of the categories of damages it seeks and reduced to one-eleventh the amount of damages it seeks from Jerney with respect to the non-director bonuses and special litigation committee investigation costs. To the extent Jerney's supplemental briefing discusses possible elements of damages since abandoned by the company, this opinion omits discussion of those issues.

45. *In re Cox Comm'ns, Inc. S'holders Litig.,* 879 A.2d 604, 614–615 (Del.Ch.2005) ("[Section] 144 has been interpreted as dealing solely with the problem of per se invalidity; that is, as addressing only the common law principle that interested transactions were entirely invalid and providing a road map for transactional planners to avoid that fate. The somewhat different question of when an interested transaction might give rise to a claim for breach of fiduciary duty, i.e., to a claim in equity, was left to the common law of corporations to answer. Mere compliance with § 144 did not necessarily suffice.") (citation omitted).

46. *See, e.g., Benihana of Tokyo, Inc. v. Benihana, Inc.,* 891 A.2d 150, 185 (Del.Ch.2005).

47. The situation is quite unlike that addressed in *Technicorp Int'l II, Inc. v. Johnston,* 1997 WL 538671 at *15–16 (Del.Ch. Aug. 25, 1997), where the court first stripped unfaithful managing fiduciaries of all profit from their misdeeds but then permitted them reasonable compensation for eleven years of service. Here, there is no question that Jerney was adequately, if not generously, compensated for his prior years of service to ICN.

result of its settlements with the other defendants or that it would be unjustly enriched by Jerney's return of his bonus. Thus, there is no inequity in requiring Jerney to disgorge the payment he received. Nor will the court apportion responsibility to account for the fact that several of the settling directors signed joint tortfeasor releases since Jerney's disgorgement obligation stems from his receipt of the company's money, not from his participation in the decision to authorize the payment. In any event, the Joint Tortfeasors Law has no application to Jerney's obligation to return his bonus.[48]

## B. *Jerney's Pro Rata Share*

■ Jerney makes two other arguments to reduce the damage claim against him. First he contends that, if he is required to pay a pro rata share of categories 3 and 4 above, his share should be one-twelfth, not one-eleventh. This argument turns on Jerney's contention that Jean–Francois Kurz, an outside director, should be counted in the total number of directors liable for the breach of fiduciary duty despite Kurz's absence from the April 10, 2002 board meeting at which the bonuses were approved. Second, Jerney argues that, because the company failed to seek the return of the bonuses from those officers and employees who were not directors, the company should not be able to recover damages from him in connection with those bonuses.

■ Kurz, who accepted a $330,500 bonus, was sued and settled the claim against him on the same terms as the other outside directors. Generally speaking, a director who does not attend or participate in the board's deliberations or approval of a proposal will not be held liable.[49] This is not an invariable rule and the result may differ where the absent director plays a role in the negotiation, structuring, or approval of the proposal.[50] Similarly, an absent director, such as Kurz, who knowingly accepts a personal benefit flowing from a self-interested

**48.** The parties' post-trial briefs raise the issue of the application of the Delaware Uniform Contribution Among Tortfeasors Law, 10 *Del. C.* §§ 6301 *et. seq.*, to damages claims for breach of fiduciary duty. This question has never been addressed directly by either this court or the Delaware Supreme Court, although at least one federal court considering the issue held that the law does apply in such circumstances. *Hollinger Int'l, Inc. v. Hollinger, Inc.*, 2006 WL 1444916, at *2 (U.S.Dist.Ct.N.D.Ill. Jan. 25, 2006). In response to the court's request for supplemental briefing on that issue, it became clear that the company is not seeking damages from Jerney beyond his pro rata share of the special litigation committee costs and non-director bonuses. Pro rata payments do not, of course, give rise to claims for contribution among persons who are jointly and severally liable for the same loss. Thus, the only demand for damages possibly raising an issue under that law is the demand that Jerney repay his entire bonus. As discussed above, however, that claim rests primarily on Jerney's obligation to disgorge the amounts paid to him in the unfair self-dealing transaction-an obligation that is not a joint liability with any of the former defendants. For these reasons, the court does not consider the application of the Joint Tortfeasor Law to this case.

**49.** *In re Tri–Star Pictures, Inc., Litig.*, 1995 WL 106520, at *3 (Del.Ch. Mar. 9, 1995) ("That being so, those directors' absence from the meeting, and their abstention from voting to approve the Combination, does, in my view, have dispositive significance, and shields these defendants from liability on any claims predicated upon the board's decision to approve that transaction.").

**50.** *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 499 at n. 12 (Del.Ch.1990) (holding that the parent company-designated directors of a subsidiary who played no role in the negotiation or approval of the going-private merger were not liable in the context of an entire fairness challenge to the terms of the transaction).

transaction and refuses to return it upon demand, can be thought to have ratified the action taken by the board in his absence and, thus, share in the full liability of his fellow directors.

In this case, the record of Kurz's involvement in the transaction is sparse: (i) he participated in the March 28, 2002 meeting of the ICN board and voted to refer the bonus issue to the compensation committee; (ii) he did not attend the April 10, 2002 meeting and, thus, did not vote on the transaction; (iii) he voiced no objection and took the money; (iv) and, when he refused to return the money, he was sued and settled. On this limited record, and solely for the purpose of reckoning Jerney's pro rata share of damages, it is appropriate to regard Kurz as having ratified or adopted the action taken by the other directors and, thus, to count him among those potentially liable to the company. Thus, the court agrees with Jerney that his pro rata share of liability for categories 3 and 4, will be deemed to be one-twelfth, rather than one-eleventh.[51]

■■■ Jerney's second argument to limit his exposure to categories 3 and 4 has no merit. The fact that the company chose not to pursue the recovery of bonuses from recipients who were not directors should not limit or restrict the company's ability to recover those amounts from the guilty self-dealing directors, including Jerney, who authorized those payments. The company's decision was necessarily tied to difficult issues of personnel management, as many of those recipients continued working for the company. Moreover, there is nothing in the record suggesting that the

company's actions interfered with whatever rights, if any, Jerney might ever have had with respect to those payments.

## C. *Special Litigation Fees And Expenses*

■■■ Jerney is liable for his share of the special litigation committee expenses incurred by the company. Under Delaware law, special litigation committee expenses are recoverable for a breach of fiduciary duty when the plaintiff corporation prevails on the suit and the special litigation committee expenses were necessary to prosecute that suit.[52] Here, the special litigation committee expenses "were made necessary by the course of events initiated by [Jerney's] breach."[53] While the majority of the damages were attributable to the recovery of Panic's bonus, Jerney will be required to pay back one-twelfth of the expenses.

## D. *Advanced Attorneys' Fees*

Since Jerney was not successful in any measure in his defense of this action, he is required by the terms of the undertaking he signed to reimburse attorneys' fees and expenses advanced by the company on his behalf in his defense. Jerney does not deny the source of this liability, but he does make the point that, because he and Panic were jointly represented in the litigation, any order requiring him to reimburse all of the amounts jointly advanced with respect to his and Panic's attorneys' fees and expenses would impose on him the obligation also to fulfill Panic's reimbursement obligation. Jerney suggests that an equitable apportionment would

---

**51.** In reaching this conclusion, the court emphasizes that the decision to limit the damages demand on Jerney to his pro rata share of categories 3 and 4 was made by the company. The company having made that concession, however, it is proper for the court to calculate that share correctly.

**52.** *Thorpe v. CERBCO, Inc.*, 1996 WL 560173, at *2 (Del.Ch. Sept. 13, 1996), *aff'd*, 703 A.2d 645 (Del.1997).

**53.** *Id.*

recognize that Panic, not he, was the focus of this lawsuit and that a majority of the fees and expenses incurred are properly attributable to Panic's defense. He suggests two methods of apportionment: first, that he should pay a fraction of the total equal to the amount of his bonus ($3 million) divided by the amount of Panic's bonus ($33 million), or one-eleventh; second, that he and the company should now engage in a supplemental proceeding to review all of his lawyers' time sheets and expense reports to fairly allocate the advancements between him and Panic.

The company, having settled with Panic after trial in a deal that made no allocation of the amounts recovered to Panic's reimbursement obligation, takes the surprisingly aggressive position that Jerney should be required to reimburse all of his and Panic's joint defense costs. In this connection, the company argues that Jerney has waived whatever right he ever had to seek contribution from Panic for payments made under their identical undertakings.

■ The court is unable to agree with any of the suggestions advanced by either party. It is fair to say that Panic, rather than Jerney, was the focus of attention throughout this litigation. This is so because Panic was the CEO, the driving force behind the bonus plan, and the recipient of 70% of the monies paid. Nevertheless, Jerney was a willing participant in the scheme, and his defense rested importantly on the successful defense of Panic. In view of this, the court rejects Jerney's suggestion that his share should be limited to one-eleventh of the total of his and Panic's joint defense costs. Such an allocation would substantially understate Jerney's liability on his undertaking. The

court also rejects the idea of a supplemental proceeding to allocate fees and expenses between Panic and Jerney. While it might be possible to identify small items that related to discovery directed to one or the other of these two men, there is no doubt that their defense was, by and large, jointly conducted. Indeed, even lawyers' time that might appear to be devoted solely to one or the other, such as attendance at Panic's deposition or the formulation of answers to interrogatories directed to Jerney, is just as readily seen as constituting an element of their joint defense.

Weighing all of the circumstances, the court concludes that the only fair outcome is for Jerney to reimburse the company for half of all fees and litigation costs advanced in connection with his and Panic's defense, or $1.875 million. Such an equal division is consistent with whatever right to equitable contribution Jerney and Panic would have against each other with respect to the obligations arising from their undertakings, the general principle being that joint obligations give rise to a right to equal contribution.[54] While Jerney and the company might have agreed, *ex ante*, to a different allocation, an equal division is a reasonable and just outcome. Jerney did retain separate settlement counsel after trial and is 100% liable for fees incurred in that endeavor.

### E. *Prejudgment Interest*

■ The company requests prejudgment interest on its judgment. Delaware law is settled that "[a] successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues."[55] Generally, the

**54.** *Estate of Keil*, 145 A.2d 563, 565 (Del. 1958); *cf. Chamison v. HealthTrust Inc.*, 735 A.2d 912, 925–26 (Del.Ch.1999).

**55.** *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del.1988).

legal rate of interest has been used as "the benchmark for pre-judgment interest." [56] This court "has broad discretion, subject to principles of fairness, in fixing the [interest] rate to be applied." [57] In this case, the parties agree that the court should set prejudgment interest at the legal rate, that the legal rate at the time of the wrong was 6.25%, and that this rate should not fluctuate during the period leading up to judgment. All that remains to be addressed is whether prejudgment interest be compounded and, if so, the period of compounding. In view of Jerney's sophistication as a senior executive officer of a public company, and in view of the fact that he has had the use of $3 million of the company's money since April 2002, fairness dictates that the award of interest should be compounded.[58] In the court's discretion, interest shall be compounded monthly.[59]

## VI.

For the foregoing reasons, judgment will be entered in favor of the company and against Adam Jerney, as set forth herein. Counsel for the company are directed to submit an appropriate form of order, on notice, within 7 days. IT IS SO ORDERED.

**56.** *Id.*

**57.** *Id.*

**58.** *Brandin v. Gottlieb*, 2000 WL 1005954, at *29 (Del.Ch. July 13, 2000)

**59.** *Gotham Partners v. Hallwood Realty Partners*, 817 A.2d 160, 173 (Del.2002).