Ricciardone, David, J.
This is an action by Salvatore C. Percia (Percia) in which he claims that VBenx Corporation (VBenx) breached a contract to pay him wages as a senior executive officer for a period beginning in March 2004 through February 2007. Percia alleges that he fully performed his obligations pursuant to the contract, and that VBenx failed to make any wage payments despite owing same upon its termination of Percia’s employment in 2007. VBenx denies the existence of a valid and enforceable contract. The defendant also contends, alternatively, that any work Percia actually did was performed poorly, and furthermore that VBenx never terminated Percia’s employment which was required to trigger any obligation to pay Percia.
This action was tried to the court, sitting without a jury, from August 29, 2011 through September 1, 2001. The parties each filed proposed findings of fact and rulings of law with the court. Arguments of counsel were heard on September 19, 2011, the court thereupon took the matter under advisement.
Now, upon consideration of such testimony of the witnesses as the court determines to be credible, the exhibits, and the written memoranda and arguments of counsel, the court makes the following findings of fact, rulings of law, and order for entry of judgment in this action.
FINDINGS OF FACT
1. Plaintiff, Salvatore Percia, is a resident of Florida.
*108 2. Defendant, VBenx Corporation, is a Delaware corporation.
3. VBenx offers entities a single destination Internet portal for employee benefits.
4. VBenx was formed in early 2004 when the five original investors involved here, Percia, J. Brent Finnegan, Peter Marcia, Kenneth F. Phillips, and Richard Baker, agreed that they would acquire from Ace Insurance the business known as YouDecide.
5. Finnegan, Baker, Philips, Marcia and Percia were the only shareholders and Directors of VBenx, at least through the time period relevant to this litigation. All were experienced businessmen.
6. The five VBenx founders each invested approximately $225,000.00 for the purchase and operation of the YouDecide business. YouDecide was formally acquired on February 28, 2004.
7. Marcia, Finnegan, and Philips at that time had employment positions with other companies that limited their day-to-day involvement with VBenx, beyond their investments. It therefore was decided that Percia and Baker would assume operational roles.
8. Percia and Baker began working full time for VBenx/YouDecide in March of 2004; Percia was its President and Chief Executive Officer while Baker became Chief Financial Officer.
9. Percia testified that he worked 40-60 hours a week, seven days a week, based at a home office in Sterling, Massachusetts. The Company was headquartered in Georgia, so Percia traveled there several times a month to supervise operations. He also traveled regularly to other cities including Hartford, Baltimore and New York to “stabilize relationships with provider partners” which were mostly insurance companies. Twelve or thirteen VBenx employees reported to Percia, and he reported regularly to the Board of Directors. In December of 2005 his title became Chief Operating Officer of VBenx, a position he maintained until February 28, 2007 when he claims that the company terminated him.
10. Percia never received payment for his work, although the company paid all of his expenses.
11. Philips’s testimony generally supported Percia’s own high assessment of his work, claiming he performed “faithfully and diligently” for the company. He praised Percia’s work in what he termed a “complicated integration” or acquisition of a company known as “Rewards Plus” during 2006. He felt that he was “thrifty” in negotiations on behalf of the company, and that he maintained positive relationships with insurance companies such as Liberty Mutual and MetLife, as well as the company’s employees.
12. Nevertheless, VBenx was never profitable from March 2004 though February of 2007, the period involved here; its losses were in the hundreds of thousands each year and appears to have survived only through regular infusions of cash through loans by the original investors, mostly Marcia and Finnegan.
13. The Board of Directors did not run VBenx with a great deal of formality. Meetings were not conducted on a regular basis apparently with little notice.
14. There is no evidence that there were any discussions in 2004 concerning compensation for the work that Percia and Baker did for VBenx.
15. By the spring of2005, the issue had been raised as evidenced by an email sent by Percia to the other four original investors/board members on May 26th of that year (Exhibit 6). The email states in part:
We have all discussed that Richard and Sal should be compensated for their efforts to date. Discussions about equity have been on the table. Richard and I would rather we all stay equal partners on the equity side and be paid cash for our efforts. We obviously recognize that we do not have any cash and would offer to defer payment until such time as there is cash available. We feel that for the efforts through March 2005 we should get $200,000. This can be paid out as first dollar as it becomes available or when we sell, paid as first dollar after all initial investments and loans have been repaid . . . (Id.)
16. Although Percia testified that there were discussions during this timeframe concerning the compensation issue, there was no evidence at trial of any negotiations or developments with regard to specific terms of such compensation, let alone an actual agreement.
17. The next occurrence with regard to the plaintiffs compensation took place when he and Baker had the law firm representing VBenx (Foley Hoag & Eliot) draft documents to address the issue late in 2005. (Percia claims it was all Baker’s doing; this is dubious, it is clear that the plaintiff played a part in the preparation of the agreement.)
18. Baker and Percia were motivated by their own interests in having a contract for payment when they interacted with the attorney, and that they wanted the contract to be approved at an upcoming board meeting. None of the other original investors were involved in the drafting of the compensation documents.
19. This interaction resulted in the formation of the document which is at the heart of this controversy, and which was admitted into evidence here (Ex. 2). The document is entitled “Employment Agreement” and provides in relevant part;
That the term of employment began on the “as of’ date of March 1, 2004, i.e., it was retroactive to the time of the acquisition.
That the term of employment was to run to February 2007, with Percia acting in a “senior executive officer capacity, initially as President and CEO with the responsibilities normally associated with such position.”
*109 That Percia was to perform his duties “in a manner which will faithfully and diligently further the business and interests of the Company.”
That the term would renew automatically by one-year periods absent advance written notice of non-renewal.
That the Company would “pay” Percia at a monthly rate of $7,500, with “such aggregate amount to be paid in accordance with Sections 6 or 7 hereof.”
That, under Section 6, Percia’s employment could be terminated (a) without prior notice for cause (as defined), “in which event the Company shall pay [Percia] within sixty (60) days of such termination an amount equal to all accrued salary, from March 1, 2004 through the date of termination, based on the monthly salary set forth [above] . . . and (b) upon 30 days’ written notice without cause, in which case event the Company shall pay to [Percia] within sixty (60) days of such termination an amount equal to all accrued salary, from March 1, 2004 through the date of termination, based on the monthly salary set forth [above].”
That, in the event of a change of control (as defined), the Company would make the same sort of payment as required in the event of a termination of employment, i.e., a lump sum of “all accrued salary, from March 1, 2004.”
That the agreement “shall be governed by and construed and enforced in accordance with the law (other than the law governing conflict of law questions) of the State of Delaware.” Ex. 2.
20. On December 20, 2005, there was a luncheon business meeting of the Directors at Locke-Ober Restaurant in Boston. Marcia did not attend. At the meeting, Baker distributed the two Employment Agreements and asked that they be signed. The Agreements were passed among Finnegan, Philips and Per-cia. Finnegan, who was Chairman of the Board of Directors, signed Percia’s Agreement, as did Percia himself.
21. The extent to which Finnegan read Percia’s Agreement is disputed, and he did not testify. The document is clearly and plainly titled “Employment Agreement” and it is apparent from the first two lines of the first page that it was retroactive to March of 2004, when Percia began working for the Company.
22. In or about March 2006, VBenx’s Board of Directors voted to have Marcia assume the role of CEO. Percia continued to work for the Company, consistent with the terms of his Employment Agreement that provided he would operate in a “senior executive officer capacity.”
23. During this period, there were active discussions concerning the issue of compensation for Percia, as seen in emails sent among the original five investors during the spring of 2006.
24. The issue was somewhat divisive, and addressed as though not even mentioned at the December 2005 meeting. For example, Ken Phillips stated on April 24, 2006 that he felt like a “sucker” while “Sal [Percia] and Richard [Baker] are getting paid to stay at home." (Ex. 9.) He later claimed to be “outraged” over the situation. (Ex. 14.) These emails of several years ago belie the generally supportive tone which Phillips demonstrated at trial toward the issue of the plaintiffs payment.
25. Phillips, at the time, went on to propose an approach to dealing with Percia and Baker’s deferred compensation claims that entailed, in summary, that the “deferred comp” claims of Percia and Baker be recognized along with similar liabilities to the other shareholders based on their varying contribution (which he described), and then putting the proposal to a Board vote. (Ex. 14.)
26. Brent Finnegan, the Chairman of the Board who signed the plaintiffs Employment Agreement, actually asked for a copy of same claiming a general lack of familiarity with it and questioning the “lack of transparency in formalizing the arrangement.” (Ex. 10.)
27. Finnegan ultimately agreed with Phillips’s suggestion as to compensation, indicating that he would “like to see a reduced/adjusted amount sit beyond equity, etc.” (Ex. 15.)
28. Minutes of a “VBenx Management Team” held on May 17, 2006 reveal an “active discussion” of Percia’s “deferred compensation arrangement,” this five months after his Employment Agreement was signed. (Ex. 13.) The compensation claimed by Percia and Baker was referred to as a “liability” of $420,000. (Id.)
29. Marcia, the new CEO, weighed in on the issue calling it potentially “fatal” if not resolved soon. (Ex 15.) He sent around a generally laudatory email regarding Percia and acknowledged that “Brent [Finnegan] committed to something and signed that agreement” even though he himself did not. (Ex. 16.)
30. Ultimately, Marcia renegotiated the rate of Per-cia and Baker’s compensation down to $5000 per month from the $7500 stated in the “Employment Agreement.” This rate would be effective July 1, 2006 and now would include Marcia himself. (Ex. 18, 33.)
31. The “Business Plan” authored by Marcia at the end of 2006 reflected the above modification and referred to the plaintiffs arrangement as a “deferred compensation agreement.”
32. None of the various proposals for addressing the “deferred compensation” issue was ever put to a vote of the disinterested directors or shareholders.
33. On December 21, 2006, Marcia sent Percia an email specifically referencing “Section 1 of the Employment Agreement” and gave notice that “the Company does not wish to renew the agreement.. . [which] will terminate on February 28, 2007.” (Ex 21, 22.)
*110 34. From that point on into the following year, Marcia and Percia jockeyed for positions via emails. Percia cast himself as being terminated as an active employee, and laid out an exit plan which would include payment of $250,000 by April 29, 2007 under his interpretation of the Employment Agreement. For his part, Marcia insisted that the company did not terminate Percia’s employment, it merely did not renew the agreement, and that no money was therefore owed Percia, at least as of then: “your deferred compensation will be paid in accordance with the company’s payment of deferred compensation amounts owed to other executives.” (Ex 27.) Baker espoused this position also. (Ex. 26.)
35. Nevertheless, I find that there was no settled deferred compensation plan “owed to other executives” or otherwise.
36. The Business Plan drafted by Marcia in December 2006 (supra, Ex 18), which speaks of compensation being made “once a breakeven rate has been achieved,” was “approved” but never “implemented” according to Marcia’s testimony. I do not find this credible evidence of the insertion of this term into the plaintiffs Employment Agreement.
37. I find that VBenx did not terminate Percia’s employment when Marcia gave notice that Percia’s Employment Agreement would not be renewed, an option that was expressly provided for in Section 1 of same. This lack of termination is further reflected in the stated intent “to execute a mutually acceptable employment agreement to take effect on March 1, 2007.” Id. I further find that the CEO’s reliance on the notice provision of the Employment Agreement evinces an intent to be bound by the Agreement.
38. There was no new agreement between the parties.
39.1 find that from the time that Percia’s Employment Agreement was actively discussed and modified by VBenx’s directors in the spring of 2006, the board members conducted themselves as though intending to be bound by that Employment Agreement with the knowledge that Percia continued to perform his obligations thereunder. By this point each shareholder/director was on notice of the terms of the Agreement. No one argued to rescind the Agreement, and each offered some input as to how to address the issue of Percia’s pay.
40.The only consistently expressed difference that VBenx’s board of directors really had with Percia’s Employment Agreement, once they actually discussed it, was that his compensation should be deferred and paid out only when the company could afford it. There was not a meeting of the minds as to this term. In fact, Percia’s apparent understanding of “deferred compensation” was that payment of his salary beginning in March 2004 would be deferred until a month or two after February 28, 2007 according to his demand of that date (Ex. 27) and the tenor of his testimony.
41. I did not find the evidence going to stock offerings via a recapitalization plan to be especially informative or persuasive on the issue of how the plaintiff was to be paid pursuant to his Employment Agreement with the defendant.
42. Marcia basically agreed that the rate of compensation that Percia was to receive pursuant to his Agreement (and its modification) was reasonable, but he took umbrage with the way in which the plaintiff performed. Marcia testified that the. plaintiff, while CEO, generated bogus financial projections that resulted in an exaggerated and baseless valuation of VBenx stock that he used to his advantage. (This was also asserted in a vitriolic email of February 24, 2008. Ex 28.) Marcia’s position is that this shows lack of performance under any interpretation of a contract, and generally unclean hands on the part of the plaintiff. I cannot give the weight to this testimony requested by the defense as I am not convinced by a preponderance of the evidence that the plaintiff was in fact the source of such financial data that resulted in the stock valuation at $1.71 back in 2006. This is so even if he asserted an opportunistic stance based upon it. (For example, he did not convert his debt to equity at this valuation as others did, but offered to sell his shares at the valuation rate plus fifty cents; later, with others, he bought at 21 cents a share.) Marcia may even be correct in suggesting that Percia was responsible for unwise management (such as in selling off certain revenue streams), or faulty bookkeeping (due to his unqualified spouse fulfilling this role), but proof of this allegations at trial likewise fell short. Marcia’s suspicions were clearly stated but inadequately bolstered by hard evidence.
43. Percia eventually resigned from VBenx, being heard to express that there were “too many chiefs.”
RULINGS OF LAW
1. Because VBenx is a Delaware corporation and the agreement at issue specifies that Delaware law governs as to all issues as to its construction and enforcement, Delaware law applies in this matter. See, e.g., Morris v. Watsco, Inc., 385 Mass. 672, 674, 433 N.E.2d 886, 888 (1982) (parties free, within limits, to agree on law governing affairs); Harrison v. NetCentric Corp., 433 Mass. 465, 472, 744 N.E.2d 622, 629 (2001) (law of state of incorporation governs questions involving corporate governance, including claim of breach of fiduciary duly).
2. Percia sues on an employment contract between himself and VBenx that was executed when he was the CEO of VBenx and a member of VBenx’s Board of Directors.
3. He was, therefore, on both sides of the transaction — the contract — that is at issue here.
4. Under Delaware law, because of the fiduciary duties he owes to the corporation and its shareholders, a corporate officer or director’s contract with the cor *111 poration is an “interested” or “insider” transaction that is enforceable only if (1) it was approved by a fully-informed, good faith vote of a majority of the disinterested members of the Board or by a like shareholder vote, and it withstands “business judgment rule” review, or (2) it withstands “entire fairness" review meaning that it was the product of a fair process (also termed “fair dealing”) and reflects a fair price. See, e.g., Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1169 (Del.Ch.), reh’g denied (Aug. 16, 1995); Valeant Pharm. Int’l v. Jerney, 921 A.2d 732, 752 (Del.Ch.) (board decision to grant officers/directors bonuses classic example of transaction subject to entire fairness review), appeal dismissed, 929 A.2d 784 (2007); Carlson v. Hallinan, 925 A.2d 506, 529-34 (Del.Ch. 2006) (executive compensation decisions subject to entire fairness review); 8 Del.C. §144(a); Weinberger v. UOP, Inc., 457 A.2d 701, 710 (1983).
5. This test applies to officer/director compensation agreements. As one Delaware court put it in analogous circumstance, “(wjhere the self-compensation involves directors or officers paying themselves bonuses, the court is particularly cognizant of the need for careful scrutiny. Self-interested compensation decisions made without independent protections are subject to the same fairness review as any other interested transaction.” Valeant Pharm., 921 A.2d at 745. See also, Carlson, 925 A.2d at 529-35.
6. The burden is on the proponent of such a contract/transaction to establish either such a vote or both fair process and fair price. See, e.g., Valeant Pharm., 921 A.2d at 745; Sample v. Morgan, 914 A.2d 647, 663-65 (Del.Ch. 2007) (burden on proponent to show vote); Carlson, 925 A.2d at 925.
7.1 find that Finnegan’s signing of the Employment Agreement at issue here at the lunch meeting of December 2005 did not constitute a proper vote of the board, nor was the document fairly presented with adequate notice beforehand or full discussion afterward; thus, there was no fair process concerning the plaintiffs compensation contract to this point.
8. By the time of the board’s contemplation of the plaintiffs Employment Agreement in the spring of 2006, there had been full notice to each member of the contract’s terms and a full discussion began thereon that lasted essentially though December of that year; the plaintiffs contract that was reformed was thus the product of a fair process as of this point. At all relevant times the Employment Agreement was referred to by the parties as a baseline of the terms of the plaintiffs payment for the work already performed and to be performed in the future for the defendant. By the latter half of 2006, there was a fair process involved in the adoption of the plaintiffs Employment Agreement by the defendant.
9. The specific amount of the plaintiffs salary was negotiated by this point with the participation of the CEO (Marcia) who urged support for this price upon the board and who would accept the same amount of compensation for himself going forward. He and VBenx cannot reasonably be heard to argue therefore that the contract involves an unfair price. Cf., Carlson v. Hallinan, 925 A.2d 506 (Del.Ch. 2006).
10. The plaintiff, by words and conduct, accepted this payment structure; there was now a meeting of the minds as to this amount of his pay from the inception of the company until February 28, 2007. Percia’s consideration for this reduced amount of compensation (beyond the promise to continue performance pursuant to the original terms) is the very enforceability that the original Employment Agreement lacked.
11. This court may not supply a deferred term of payment by the defendant where the wording of the Employment Agreement is clear and does not include such provision. “(A court] may not rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal.” Nemec v. Shrader, 991 A.2d 1120, 1126 (Del. 2010). Although deferring payment until the company “breaks even” may have been desired by the defendant’s board of directors, it was not negotiated, agreed to by the plaintiff, or put to a formal vote, in spite of the wording of the document authored by Marcia entitled “2006/2007 Interim Business Plan Review.” (Ex. 18.)
12. Under the Agreement, if the plaintiffs employment were terminated, or if there were a change in control of the corporation, payment of “all accrued salary” would be due within thirty or sixty days of such event. Since there was no such termination or change in control here, the accrued salary can only fairly be interpreted as due as of the end of the defined term of the contract, i.e., February 28, 2007. To conclude otherwise, as the defendant urges, is to assume that termination, or change in control, are the only conditions precedent that require payment. This would mean that the defendant would never be obliged to perform its part of the contract simply by refusing to renew the contract as it did here; this is an absurd result and would render the parties’ intentions nonsensical. (Not only would the compensation not be “deferred,” it would never be payable under this reasoning.) Therefore, I find that the defendant breached the contract as of March 1, 2007 when no payment was made to the plaintiff by this date.
13. Accordingly, plaintiffs claim for contractual damages is not barred in any way by the three-year period of limitations under 10 Del.C. §8106.
14. The defendant is liable to the plaintiff for twenty-eight months of payment at $7500.00 per month (i.e., beginning March 2004 and ending June 2006, inclusive) and eight months of payment at $5000.00 per month (from July 1, 2006 through February 28, 2007) for a total of $212,500.00.
*112 ORDER FOR JUDGMENT
Upon these findings of fact and conclusions of law, the court hereby ORDERS the entry of judgment in favor of the plaintiff, Salvatore C. Percia, and against the defendant, VBenx Corporation for contractual damages in the amount of $212,500.00.