# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE PILGRIM'S PRIDE CORPORATION | ) | Consol. C.A. No. |
| DERIVATIVE LITIGATION | ) | 2018-0058-JTL |

## MEMORANDUM OPINION

Date Submitted: December 21, 2018
Date Decided: March 15, 2019

Kurt M. Heyman, Melissa N. Donimirski, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Jason M. Leviton, Joel A. Fleming, BLOCK & LEVITON LLP, Boston, Massachusetts; Mark Lebovitch, Edward G. Timlin, David MacIsaac, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York; *Counsel for Plaintiffs.*

Kevin G. Abrams, Michael A. Barlow, Andrew J. Peach, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Michael B. Carlinsky, Adam M. Abensohn, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Counsel for Defendants JBS, S.A., JBS USA Holding Lux S.à r.l., William Lovette, Andre Nogueira De Souza, Gilberto Tomazoni, Tarek Farahat, and Denilson Molina.*

Kevin R. Shannon, Christopher N. Kelly, Jaclyn C. Levy, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Nominal Defendant Pilgrim's Pride Corporation.*

**LASTER, V.C.**

The plaintiffs are minority stockholders in nominal defendant Pilgrim's Pride Corporation (the "Company"), which is a Delaware corporation. They sued the Company's controlling stockholder, JBS S.A. ("Parent"), which is an entity organized under Brazilian law.[1] They also sued five individuals whom Parent elected to the Company's board of directors (respectively, the "Director Defendants" and the "Board"). All five Director Defendants are executive officers of Parent or serve as executive officers of its controlled subsidiaries. One of the Director Defendants serves as the Company's CEO.

The plaintiffs challenge a transaction in which the Company paid $1.3 billion to buy one of Parent's other subsidiaries: Moy Park, Ltd. (the "Acquisition"). The complaint alleges that Parent needed to raise cash quickly after its controlling stockholder agreed to pay a $3.2 billion fine to the Brazilian government. Because Parent controlled the Company and Moy Park, the plaintiffs assert that the governing standard of review for the Acquisition is entire fairness. The plaintiffs contend that as a self-dealing fiduciary, Parent is obviously interested in the Acquisition and must prove that it is entirely fair. Plaintiffs further allege that because of their affiliations with Parent, all five of the Director Defendants lack independence and likewise must prove that the Acquisition is entirely fair.

---

[1] Parent controls the Company through defendant JBS USA Holding Lux S.à r.l., a wholly owned subsidiary of Parent that is organized under the laws of Luxembourg. For purposes of this decision, there is no meaningful distinction between Parent and the intermediate holding company. The two entities have raised identical arguments, and the reasoning in this decision applies equally to both. For simplicity, this decision refers only to Parent.

The complaint alleges that the Company did not engage in true arm's-length bargaining with Parent. Among other things, the Company permitted its management team and its financial advisor to lead the negotiations, despite their lack of independence from Parent. As part of the pseudo-negotiations, the Company responded "in a constructive manner" when Parent breached its exclusivity agreement with the Company. As a result of a defective process, the Company ultimately agreed to pay what was effectively the same price that Parent demanded in its opening ask, even though that price was higher than what the Company's internal analyses supported and what strategic bidders were willing to pay. Based on these allegations, the plaintiffs contend that the complaint supports a reasonable inference that the defendants will not be able to prove that the Acquisition was entirely fair.

Parent moved to dismiss the complaint for lack of personal jurisdiction, noting that the complaint does not allege that Parent has any ties to the State of Delaware other than its status as the controller of the Company. But on the same day that the Acquisition was approved, the Board voted unanimously to adopt a forum-selection bylaw, with the Director Defendants whom Parent controlled constituting a five-member majority of the nine-member Board. The bylaw made the Delaware courts the exclusive forum for breach of fiduciary litigation involving the Company. This decision holds that on the facts alleged, Parent implicitly consented to personal jurisdiction in this court for purposes of claims falling within the forum-selection bylaw.

The Director Defendants also moved to dismiss the complaint, contending that it failed to allege any actionable involvement in the Acquisition. The Board formed a committee of independent directors (the "Committee") to consider the Acquisition, and the

2

Board delegated to the Committee the exclusive authority to negotiate its terms and determine whether the Company would proceed. The Committee retained its own financial advisor and legal counsel, negotiated with Parent, and approved the Acquisition. The Director Defendants maintain that they approved the Acquisition solely to ensure that it did not violate a covenant in the Company's bond indenture.

Two Director Defendants—William Lovette and Andre Nogueira De Souza—participated in the negotiation and approval of the Acquisition to a far greater degree, rendering them potentially liable for the allegedly unfair transaction. As to the other three Director Defendants, although their approval of the board resolution is a slim reed, it constitutes sufficient involvement by conflicted fiduciaries in the effectuation of a self-dealing transaction to warrant denying their efforts to obtain dismissal at the pleading stage.

## I.     FACTUAL BACKGROUND

The facts are drawn from the plaintiffs' complaint and the documents it incorporates by reference, including documents that the plaintiffs obtained using Section 220 of the Delaware General Corporation Law (the "DGCL"), 8 *Del. C.* § 220. Despite relying on these documents, the plaintiffs did not attach them as exhibits to their complaint. The defendants have supplied some of the omitted documents, which the court can consider. *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms." (alteration in original) (internal quotation marks omitted)). Citations in the form "Ex. — at — " refer to these documents, which the defendants attached to their initial briefs as exhibits. *See* Dkts. 23, 41. At this

stage of the proceedings, the complaint's allegations are assumed to be true. The plaintiffs also receive the benefit of all reasonable inferences, including inferences drawn from documents.

**A.      The Company, Parent, and Moy Park**

The Company sells chicken in the United States. Its stock trades on Nasdaq under the symbol "PPC."

Parent is one the largest meat processors in the world. At the time of the Acquisition, Parent controlled the Company through its ownership of 78% of the Company's common stock. Parent also controlled the Company through its right to designate a majority of the Board.

Under the Company's certificate of incorporation, the Board consists of nine seats. Six seats are designated for "JBS Directors," whom this decision calls "Parent Directors." Three seats are designated for "Equity Directors."[2] A nominating committee populated by Parent Directors nominates directors for the Parent Director seats, and a nominating committee populated by Equity Directors does the same for the Equity Director seats.[3]

---

[2] *See* Ex. 15 § 5.3. The allocation of seats depends on the level of Parent's ownership of the Company's common stock. The current allocation applies so long as Parent beneficially owns at least 50% and not less than 80% of the shares. *See id.* § 5.2(b).

[3] *See id.* § 5.4. The original Equity Directors were designated by a committee of equity holders appointed as part of a Chapter 11 bankruptcy proceeding. *See* Dkt. 59 Ex. 5 Ex. A §§ 1.55, 9.2 (*In re Pilgrim's Pride Corp.*, C.A. No. 08-45664, Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (As Modified) (Bankr. N.D. Tex. 2009)).

Parent has the right to veto the nomination of an Equity Director, but only if Parent "reasonably determines that such person (i) is unethical or lacks integrity or (ii) is a competitor or is affiliated with a competitor of the Corporation." Ex. 15 § 5.4(a).

Parent can vote its shares as it pleases for the Parent Directors, meaning that Parent can determine who serves in those positions. *See* Ex. 3 § 3.04(b). For the Equity Directors, by contrast, Parent must vote its shares "in the same proportion as the shares held by the Minority Investors are voted for or against, not voted, or abstained." *Id.* § 3.04(a). As a practical matter, the Company's minority stockholders determine who serves as an Equity Director.

At the time of the events giving rise to this litigation, the Equity Directors were David Bell, Michael Cooper, and Charles Macaluso. Each appears for pleading purposes to be an independent, outside director. Four of the Parent Directors served as executive officers of Parent or its subsidiaries—defendants Andre Nogueira De Souza, Tarek Farahat, Denilson Molina, and Gilberto Tomazoni. A fifth Parent Director was William Lovette, the Company's CEO and President. The final Parent Director was Wallim Cruz de Vasconcellos, Jr., who has no alleged affiliation with Parent or the Company other than his service as a Parent Director.

Moy Park sells chicken in the United Kingdom. Before the Acquisition, it was a wholly owned subsidiary of Parent. Parent purchased Moy Park in 2015 for approximately $1.5 billion.

5

**B.    Parent Needs To Raise Cash.**

The Batista family controls Parent through a holding company. In May 2017, the holding company agreed to pay a fine of $3.2 billion (R$10.3 billion) to the Brazilian government in response to a wide-ranging investigation into the bribery of government officials. Parent needed to raise cash quickly to help its controlling stockholder pay the fine.

In June 2017, Parent announced that Moy Park was for sale. Wesley Mendonça Batista, who was serving as Parent's CEO and who himself had pled guilty to a bribery charge and agreed to pay a substantial fine, contacted Nogueira. Batista told Nogueira that Parent would be interested in selling Moy Park to the Company for £1.01 billion ($1.3 billion). Nogueira shared the overture with Lovette, who engaged in further discussions with Parent about the proposal.

**C.    The Initial Meeting With The Equity Directors**

On June 28, 2017, Lovette met with the Equity Directors. Other attendees included bankers from Barclays Capital, Inc., who were acting as the Company's financial advisor despite having a longstanding relationship with Parent, and lawyers from Paul, Weiss, Rifkind, Wharton & Garrison LLP. Vasconcellos, one of the Parent Directors, also attended.

Lovette pitched the Equity Directors on having the Company acquire Moy Park for £1.01 billion ($1.3 billion). He described the acquisition as a "compelling opportunity" with "a strong strategic rationale." Ex. 1 at 2. He argued that even though Moy Park's

6

facilities already implemented "best practices," his management team could "increase[e] efficiencies in operations and headcount." *Id.*

Barclays had already prepared a presentation that valued Moy Park at between £700 million and £1.415 billion. In arriving at this range, Barclays projected generous growth in Moy Park's revenue and EBITDA, even though Moy Park's revenue had been flat over the previous three years. Barclays also assumed £41.6 million in post-Acquisition synergies.

Barclays presented four financing alternatives for purchasing Moy Park. In each case, Barclays assumed a purchase price of £1.05 billion. Ex. 4 at 16.

### D.    The Committee

On July 3, 2017, the Board formed a special committee consisting of the Equity Directors (the "Committee"). The Board delegated to the Committee its "exclusive power and full authority . . . to take all actions it considers necessary, appropriate or desirable in connection with evaluating, reviewing, negotiating and implementing the [Acquisition] and any alternative thereto." Ex. 2 at '012. The Board also resolved to "not approve or recommend the [Acquisition] unless the [Acquisition] was approved by the . . . Committee." *Id.*

The Committee retained Evercore as its financial advisor. Evercore informed Barclays that the Committee and its advisors expected to lead the negotiations with Parent, rather than having Company management and Barclays take the lead. Notwithstanding the Committee's instruction, Company management and Barclays continued to take the lead in the negotiations with Parent.

7

The Committee retained Paul Weiss as its legal counsel. Recall that Paul Weiss had attended Lovette's meeting with the Equity Directors on July 28, 2017, six days before the formation of the Committee that ultimately became Paul Weiss's client. At the pleading stage, this sequence supports a reasonable inference that management had some degree of involvement in the selection of the Committee's counsel.

### E. Evercore's Initial Valuation

On July 6, 2017, Evercore provided the Committee with its initial reactions to Barclays' valuation analyses. Evercore told the Committee that it planned to work with Barclays to conduct due diligence but would perform its own valuation work. Evercore also informed the Committee that it would analyze any efficiencies that the Company could achieve on a stand-alone basis, independent of the Acquisition, as distinct from synergies that could only be generated as a result of the Acquisition.

On July 18, 2017, Evercore provided the Committee with its preliminary valuation analysis. In its presentation, Evercore relied on management's projections and synergy estimates, which yielded results nearly identical to Barclays' calculations. Evercore expressed 80% confidence in the Company's ability to realize the synergies. Without synergies, Evercore valued Moy Park in the range of £700 million to £1.038 billion ($905 million to $1.132 billion). The complaint does not describe Evercore's with-synergies valuation, and neither side provided copies of the underlying materials.

Evercore told the Committee that Parent hoped to sell Moy Park within three weeks and that other suitors had executed non-disclosure agreements. The Committee discussed whether Parent "might be willing to accept a lower price from the Company . . . than from

third parties" because Parent "would retain Moy Park's earnings in such a transaction." Ex. 5 at 4.

After Evercore's presentation, Lovette and Sandri joined the meeting. Lovette endorsed the deal and expressed confidence in the estimated synergies. Lovette then disclosed the conversation he had with Nogueira in June 2017 about Parent's interest in the Company. Lovette did not disclose Nogueira's earlier conversation with Batista.

## F.    The Committee Offers £925 Million.

On July 27, 2017, the Committee met with Barclays and members of Company management. Barclays presented an updated valuation of Moy Park. Sandri updated the Committee on "exchanges between Parent and the Company." Ex. 7 at 1–2.

After excusing Barclays and the members of management, Evercore presented an updated valuation. It closely resembled the firm's analysis from July 18, 2017, except this time Evercore did not provide an analysis of Moy Park's value without synergies. Evercore reported that nine strategic bidders had signed non-disclosure agreements. The Committee decided to submit an indication of interest "at a cash-free, debt-free value of £925 million." Ex. 7 at 4.

On July 31, 2017, news outlets reported that multiple parties were interested in acquiring Moy Park. Later that day, the Committee directed Evercore to submit the Company's indication of interest and to ask for exclusivity.

## G.    Parent Counters at £1.05 Billion.

On August 4, 2017, Russ Colaco, Parent's Chief Financial Officer, asked the Company to pay £1.05 billion for Moy Park. He also conveyed that Parent wanted to sign

9

and close the deal simultaneously before August 15. To give the Committee the first chance at the deal, he proposed to delay seeking third-party bids until August 17.

When the Committee met later that day, Barclays and Evercore reported that financing a simultaneous sign-and-close structure would be more expensive than a traditional deal. The Committee discussed making a counteroffer in a range of £925 to £950 million, but deferred making a decision on a specific figure.

On August 5, 2017, the Committee met with Barclays and members of Company management. They advised the Committee that a simultaneous signing and closing would result in $15 million of additional financing costs compared to the alternative. The Committee decided to counter at "£955 million for a transaction with a bifurcated signing and closing that include[d] a customary marketing period" or "£940 million for a transaction with a simultaneous signing and closing." Compl. ¶ 72 (alteration in original).

That afternoon, Parent responded that it had received another offer at approximately the same valuation. Parent declined to commit to exclusivity.

## H. The Company Bids £975 Million.

During the following week, Parent's counsel informed Paul Weiss about Batista's original conversation with Nogueira. This was the first time that Paul Weiss learned about the conversation. Parent's counsel told Paul Weiss that Batista's references to pricing were not intended as a formal offer.

In a separate call, Colaco told Barclays that Parent had received a bid of £1.05 billion and that they expected that amount to increase to £1.1 billion. Colaco subsequently told Barclays that Plukon Food Group was the high bidder. With Plukon's offer in hand,

10

Parent made a revised demand: "a purchase price of £1 billion (~$1.3 billion at current exchange rates)" and a "maximum 30 days to get a deal done." Ex. 8 at 2.

On August 9, 2017, the Committee met with Company management and Barclays. Barclays summarized the bidding landscape: "1 clear leader [Plukon]," three bidders "around the value the Company proposed," and other bidders below the Company's offer. *Id.* at 3. Everyone regarded Plukon's bid as credible.

At these valuations, the Committee questioned whether the Company should pursue the Acquisition. The members asked whether the deal "would be accretive at values between £955 million and £1 billion." *Id.* They also expressed concern about "the appropriate multiple to apply to [Moy Park]'s earnings." *Id.* at 4. Finally, they noted that management had described Moy Park as a "'nice to have' asset," not a necessity. *Id.*

At this point, Lovette spoke up to explain "why he was excited about the Potential Transaction." *Id.* He identified the following reasons for moving forward:

- "the Company has had difficulty deploying capital in a manner that creates growth";

- "the Company's existing leverage ratio of .9x is suboptimal";

- "finding an acquisition target as attractive as Moy Park is difficult";

- "Moy Park would interest a new group of investors in the Company";

- "the Potential Transaction would allow the Company to enter a completely new but related market";

- "the Potential Transaction would allow the Company to grow into a business in which it has sought growth (prepared foods)";

- "Moy Park 'checks all the boxes' for what the Company has described to the public that it looks for in an acquisition target"; and

11

- "the acquisition of Moy Park would allow the North American business to learn from Moy Park's innovations and consumer insights."

*Id.* at 4–5. After making these points, Lovette reiterated that

> (i) he is very excited about the opportunity to acquire Moy Park, (ii) if the Potential Transaction did not materialize he would view it as a missed opportunity and (iii) there are few opportunities to deploy capital in a manner that would grow the business as he believes Moy Park would.

*Id.* at 5. Finally, Lovette observed that "the Potential Transaction would make the Company the only global 'pure play' chicken company." *Id.*

After Lovette's remarks, the Committee regarded the Acquisition more favorably. The members concluded "that the calculated synergies can justify a higher price than the Company's current offer of £955 million and the uncalculated synergies described by its advisors and management offer potential additional value." *Id.*

Barclays and management then left the meeting. With only the Equity Directors present, Evercore stated that it could easily issue a fairness opinion at a price above £1 billion. The Committee decided to counter at £975 million, just £30 million (3%) less than what Batista originally suggested as a price in his discussion with Nogueira.

## I. The First Agreement On Price

On August 12, 2017, Parent accepted the Committee's counteroffer, but conditioned its acceptance on a simultaneous signing and closing and the execution of definitive transaction documents within one week. At noon on that day, the Committee directed Paul Weiss to counter at £975 million with a bifurcated signing and closing or £970 million with a simultaneous signing and closing. Internally, the Committee regarded the price difference as immaterial and something that "should not stand in the way if [Parent] balked." Compl.

12

¶ 75 (internal quotation marks omitted). The Committee directed Paul Weiss to ask for more time to execute the agreement and "a 'rolling' exclusivity period that would start with . . . seven days . . . but only be terminable on two business days' notice." *Id.* (alterations in original) (internal quotation marks omitted).

After receiving the Company's counteroffer, Colaco called both Lovette and Evercore. In each call, Colaco demanded £975 million with a simultaneous signing and closing. In addition, Parent's counsel called Paul Weiss to underscore Colaco's demand. Parent's counsel relayed "that [Parent] would allow the Company sufficient time to negotiate with its lenders, which could take 2-3 weeks." *Id.*

At 4:00 pm, Evercore met with the Committee and opined that paying £975 million to Parent for Moy Park was fair to the Company's minority stockholders. The Committee approved the price.

Based on the resulting agreement on price, Parent agreed to negotiate exclusively with the Company through August 27, 2017. The plaintiffs criticize the Committee for offering £975 million, arguing that the Company had "extraordinary leverage" because it was the only bidder who could execute on the schedule that Parent wanted. *Id.* ¶ 76. The plaintiffs argue that an arm's-length negotiator would have used its leverage and insisted on a much a lower price.

## J.  Parent Breaches Exclusivity And Re-trades The Deal.

To fund the Acquisition, the Company needed debt financing. Rather than exploring multiple sources, the Committee only considered a proposal from Barclays. That proposal contemplated a bridge loan commitment of $1.2 billion with $800 million funded at

closing. The loan would mature after seven years. Barclays would receive fees of $39 million.

On August 19, 2017, news outlets reported that a Chinese conglomerate was the frontrunner to clinch Moy Park. On August 21, the Committee met with Lovette and Sandri. Lovette told the Committee that they were negotiating with Barclays over its financing fees. No one discussed the news reports or considered whether Parent had breached its exclusivity agreement.

On August 25, 2017, Parent told Evercore that it had "received an unsolicited offer from a credible third party to acquire Moy Park for £1.125 billion." *Id.* ¶ 79 (internal quotation marks omitted). Parent conceded that it had breached its exclusivity obligation, but provided the following explanation: "[A] third-party bidder had made an unsolicited call to a [Parent] senior executive who was not a fully integrated member of the [Parent] deal team and who, apparently, was not aware of [the] exclusivity agreement that had been entered into between [Parent] and the Company." Ex. 10 at 3.

Parent now demanded a price of £1 billion. To soften the blow, Parent offered to provide the Company with financing on better terms than Barclays. Parent's proposal offered a lower interest rate than Barclays' proposal, but its bridge loan would mature after two years rather than seven years. Parent later reduced the maturity to one year.

## K. The Second Agreement On Price

On August 27, 2017, the Committee met with its advisors and members of Company management. Paul Weiss advised that the difference in the bridge loan maturities between Parent's proposal (one year) and Barclays' proposal (seven years) was immaterial because

14

the bridge loan would be replaced with bond financing soon after closing. If the bonds issued within sixty days, then the lower interest rate on Parent's proposal would enable the Company to save $25 million in interest compared to Barclays' proposal. If the bonds issued between sixty and 180 days after closing, then the savings would increase to $30–40 million. But if the bridge loan was not refinanced, then Barclays' loan was preferable.

The Committee picked Parent's financing proposal, reasoning that the estimated benefit of $25–26 million would offset Parent's demand for a purchase price of £1 billion, which was $32.5 million higher than the previously agreed price of £975 billion. The Committee decided to ask Parent to provide the Company with another $11 million in value through credits under a services agreement or through adjustments in the exchange rate.

The Committee also discussed Parent's breach of its exclusivity commitment. Lovette recommended that the Committee address the issue "in a constructive manner," and the Committee agreed. Ex. 10 at 4.

The Committee authorized an offer of £1 billion using Parent's financing. Parent accepted the economic terms, including the concept of $11 million in incremental savings under a shared services agreement.

## L.     The Committee Formally Approves The Acquisition.

During a meeting of the Committee on September 5, 2017, Evercore gave a formal presentation addressing the fairness of the Acquisition. Evercore reported that the purchase price fell at the high end of its comparable companies analysis, but at the low end of its comparable transactions and discounted cash-flow analyses. The complaint alleges that Evercore misrepresented its analyses and that the valuation only fell at the low end of the

discounted cash flow analysis that included synergies. At the end of its presentation, Evercore delivered its fairness opinion orally. Evercore did not address the terms of Parent's financing package.

Barclays then presented its own analysis of the Acquisition. At the conclusion of its presentation, Barclays opined that Parent's financing package "was generally better than [what] the Company could achieve from a third party arm's-length financing." Ex. 11 at 4. Evercore "noted that [it] fully agreed with the Barclays assessment." *Id.* The Committee never independently investigated any options for arm's-length, third-party financing.

The Committee asked if management still supported the transaction. Lovette responded, "management was very happy with the deal." *Id.* at 5.

After excusing management and Barclays, the Committee consulted with Paul Weiss, who reported that Barclays would be the lead arranger for the take-out bond financing. Paul Weiss believed that this meant that the refinancing would occur earlier than expected, reducing the benefit conferred by the lower interest rate from $25 million to $18–20 million. The Committee regarded this change as immaterial.

The Committee concluded by approving a set of resolutions that counsel had prepared. They included determinations that the Acquisition and the terms of Parent's financing were on an arm's-length basis. Because Macaluso would be travelling the following week, the Committee appointed Bell and Cooper to a subcommittee "to approve any non-material changes to the terms of the transaction that may arise prior to finalization of the definitive agreements." *Id.* at 6.

**M.    The Board And The Committee Approve The Acquisition.**

On September 6, 2017, the Board approved the Acquisition. The Board did so to satisfy a requirement under a provision in a bond indenture (the "Indenture") which required Board approval of any transaction with an affiliate "in excess of $100.0 million." Ex. 14 § 4.13(a)(2). To satisfy the Indenture, the Board certified that "the terms of the transactions . . . are not less favorable in any material respect to the [Company] than those that could reasonably be obtained in arm's-length dealings with any person that is not an Affiliate (as defined in the Indenture)." Compl. ¶ 89.

Two days later, on September 8, 2017, the Committee approved the agreements governing the Acquisition.

On the same day, the Board adopted a bylaw that selected the Delaware Court of Chancery as "the sole and exclusive forum for" disputes related to the internal affairs of the Company. *Id*. ¶ 90 (the "Forum-Selection Bylaw").

**N.    This Litigation**

On January 24, 2018, the plaintiffs filed this action. The complaint named as defendants Parent, all of the members of the Board, and certain members of the Batista family. Between March 14 and July 3, the plaintiffs voluntarily dismissed the Equity Directors, Vasconcellos, and the members of the Batista family.

Parent moved to dismiss the complaint for lack of personal jurisdiction. The Director Defendants moved to dismiss the complaint on the grounds that it did not allege that they had engaged in actionable conduct.

17

The defendants assumed for purposes of their motions to dismiss that entire fairness provided the operative standard of review. But the complaint and the related briefing highlighted the Board's governance structure, including the ability of the minority stockholders to elect the Equity Directors. This structure would qualify the Equity Directors as enhanced-independence directors, as that term was defined in a provocative article by Lucian Bebchuk and Assaf Hamdani titled *Independent Directors and Controlling Shareholders,* 165 U. Pa. L. Rev. 1271 (2017). As Bebchuk and Hamdani explain, Delaware's hierarchy of standards of review uses entire fairness to review a self-dealing transaction involving a controller. Although parties can obtain a shift in the burden of proof on entire fairness by either conditioning the transaction on approval by a majority of the minority stockholders or the involvement and approval of an effective special committee, there is currently only one structural means of lowering the standard of review to the business judgment rule: the *MFW* framework in which the controller conditions the completion of transaction up front on *both* special committee approval *and* a majority of the minority vote. *See Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

Bebchuk and Hamdani observe that while the *MFW* framework works well for major transactions like squeeze-out mergers, its significant requirements undermine its utility for other types of interested transactions involving a controller. They note that Delaware courts historically have not endorsed using the business judgment rule for interested transactions involving a controller because of concern about the controller's ability to influence the selection, election, and removal of otherwise independent directors. They suggest that these concerns are mitigated when minority stockholders have the power

18

to nominate, elect, and remove director representatives, whom they describe as enhanced-independence directors. They recommend that a transaction approved by a duly empowered committee whose members consist of enhanced independence directors should receive more deferential review.

Based on my knowledge of Bebchuk and Hamdani's article, I raised *sua sponte* whether their proposed legal framework should apply to this case, and I requested supplemental briefing from the parties on that issue. In their supplemental brief, the defendants argued that dismissal is warranted because the business judgment rule should provide the operative standard of review. In their supplemental brief, the plaintiffs identified a series of questions of first impression that this court would have to confront, as well as areas of tension between the enhanced-independence approach and other areas of Delaware law. They argued that the enhanced-independence framework should be considered only in a case where the defendants specifically rely on it and provide the court will full briefing on the subject.

Having reviewed the allegations and arguments, I agree that the current record does not provide an adequate basis for assessing the many questions of first impression raised by the enhanced-independence approach.[4] This decision therefore does not consider that approach any further.

---

[4] For example, an insightful paper responds to Bebchuk and Hamdani by arguing that a meaningful analysis of independence must examine not only a controller's power to punish uncooperative directors through removal, but also the controller's ability to reward cooperative directors through patronage. *See* Da Lin, *Beyond Beholden*, 44 J. Corp. L. (forthcoming 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3335195. The

19

## II. LEGAL ANALYSIS

The defendants have moved to dismiss the complaint on different grounds. Parent contends that this court cannot exercise personal jurisdiction over it. The Director Defendants contend that as to them, the complaint fails to state a claim upon which relief

---

article supports its arguments with empirical analysis of controller patronage networks and examples in which controllers appear to have rewarded cooperative directors. The article recommends that Delaware law should not approach the question of control or its implications in a binary and monolithic fashion, but rather should take into account how different types of controllers vary in their ability and inclination to exert influence and provide patronage. Under the author's approach and based on her work, an enhanced-independence framework, standing alone, would not automatically be sufficient to warrant a deferential standard of review.

On a doctrinal level, another open question is whether a judicial willingness to deploy a more deferential standard of review for transactions approved by enhanced-independence directors warrants moving all the way to the business judgment rule, or whether it would mean relaxing the standard to enhanced scrutiny. The latter standard would recognize the structural difficulties that outside directors face when making decisions that affect a controller. The intermediate standard is sufficiently deferential to enable courts to dismiss weak complaints, while at the same time permitting meaningful complaints to move forward.

The plaintiffs observe that by drawing distinctions based on how a director is nominated and elected, the enhanced-independence approach runs contrary to *Aronson* and its progeny, which have refused to take those factors into account. *See Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984) (subsequent history omitted). I agree with this assessment, but I also believe that a more nuanced and realistic approach to independence should consider mechanisms for nomination, election, and removal, not as binary determiners of independence, but as part of a holistic analysis akin to what the Delaware Supreme Court has recently applied when addressing demand futility. *See Sandys v. Pincus*, 152 A.3d 124, 129–34 (Del. 2016); *Del. Cty. Empls. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1020–24 (Del. 2015). In my view, moving away from the bright-line rule that refuses to consider mechanisms for nomination, election, and removal is a feature, not a bug.

can be granted because they did not participate in the negotiation or approval of the Acquisition in an actionable way. This decision rejects these arguments.

## A. Personal Jurisdiction

"When a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant." *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007). "In ruling on a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record." *Id.* "If . . . no evidentiary hearing has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction and 'the record is construed in the light most favorable to the plaintiff.'" *Id.* (footnote omitted) (quoting *Cornerstone Techs., LLC v. Conrad*, 2003 WL 1787959, at *3 (Del. Ch. Mar. 31, 2003) (Strine, V.C.)).

A defendant can agree to a court's exercise of personal jurisdiction. As the Supreme Court of the United States has recognized, "the personal jurisdiction requirement is a waivable right [and] there are a 'variety of legal arrangements' by which a litigant may give 'express or implied consent to the personal jurisdiction of the court.'"[5] The Delaware

---

[5] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 n.14 (1985) (citations omitted); *accord Genuine Parts Co. v. Cepec*, 137 A.3d 123, 130 (Del. 2016); *Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013); *see Sternberg v. O'Neil*, 550 A.2d 1105, 1109 n.4 (Del. 1988) ("A party may submit to a given court's jurisdiction by contractual consent."), *abrogated on other grounds by Genuine Parts*, 137 A.3d at 123; *see also Ins. Corp. of Ir., Ltd. v. Compagnie de Bauxites de Guinee*, 456 U.S. 694, 703 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."); *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 316 (1965) ("[P]arties to a contract may agree in advance to submit to the jurisdiction of a given court . . . ."); *Petrowski v. Hawkeye-Sec. Ins. Co.*, 350 U.S.

21

Supreme Court has expressed similar sentiments: "Where the parties to the forum selection clause have consented freely and knowingly to the court's exercise of jurisdiction, the clause is sufficient to confer personal jurisdiction on a court."[6]

Consent to personal jurisdiction is often express, but it can also be implied. Outside of Delaware, the majority rule holds that when parties agree to litigate in a particular forum, they consent implicitly to the existence of personal jurisdiction in that forum.[7] In reaching

---

495, 495–96 (1956) (holding that stipulation to personal jurisdiction in particular forum is valid waiver of individual right).

[6] *Carlyle*, 67 A.3d 373, 381 (Del. 2013); *accord Burger King*, 471 U.S. at 472 n.14 ("Where such forum-selection provisions have been obtained through 'freely negotiated' agreements and are not 'unreasonable and unjust,' their enforcement does not offend due process." (citation omitted)); *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1228 (Del. 2018) ("Where a party commits to the jurisdiction of a particular court or forum by contract, such as through a forum selection clause, a 'minimum contacts' analysis is not required as it should clearly anticipate being required to litigate in that forum." (footnote omitted)); *Genuine Parts*, 137 A.3d at 148 ("[A] party to a non-adhesion contract can subject itself to personal jurisdiction via a forum-selection clause."); *see* R. Franklin Balotti & Jesse A. Finkelstein, DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 13.4[A] (3d ed. 2019) ("Consent to personal jurisdiction is considered a waiver of any objection on due process grounds and an analysis under minimum contacts is unnecessary." (internal quotation marks omitted)); *see also* 4 Charles Alan Wright et al., FEDERAL PRACTICE & PROCEDURE § 1067.3 (4th ed. 2018) ("[P]ersonal jurisdiction can be based on the defendant's consent to have the case adjudicated in the forum, or the defendant's waiver of the personal jurisdiction defense. Conduct that has been held to constitute consent or a constructive waiver often includes . . . entering into an agreement with a forum-selection clause . . . ." (footnotes omitted)).

[7] *See, e.g.*, *BouMatic, LLC v. Idento Operations, BV*, 759 F.3d 790, 793 (7th Cir. 2014) ("According to [the defendant], if it agreed orally to anything (which it denies) it specified Wisconsin as a forum but did not agree to personal jurisdiction. That makes no sense. A forum-selection clause can work only if both parties are amenable to suit in the chosen forum; to agree to a forum thus is to agree to personal jurisdiction in that forum."); *St. Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc.*, 270 F.3d 621, 623, 624 (8th Cir. 2001) (holding that defendant consented to personal jurisdiction when it agreed to the

following clause: "All matters in dispute between [Courtney] and SPRS in relation to this Agreement, and whether arising during or after the period of this Agreement, shall be referred for arbitration in the following manner: . . . The matter shall be determined by arbitration conducted in the City of St. Paul, State of Minnesota . . . . The arbitrator(s) shall apply the substantive law of the State of Minnesota as the proper law of this Agreement" (alterations in original) (internal quotation marks omitted)); *Kevlin Servs., Inc. v. Lexington State Bank*, 46 F.3d 13, 14–15 (5th Cir. 1995) (holding that defendant consented to personal jurisdiction when it agreed to the following clause: "This contract shall be interpreted and construed in accordance with the laws of the State of Texas. The legal venue of this contract and any disputes arising from it shall be settled in Dallas County, Texas" (internal quotation marks omitted)); *Weber Aircraft, L.L.C. v. Krishnamurthy*, 2013 WL 1898280, at \*4 (E.D. Tex. Apr. 12, 2013) (holding that defendant consented to personal jurisdiction when it agreed to the following clause: "The parties agree that this Agreement is to be governed by and construed under the laws of the State of Texas without conflicts of law provisions. The parties further agree that all disputes shall be resolved exclusively in state or federal court in Dallas County, Texas" (internal quotation marks omitted)); *Incline Energy, LLC v. Penna Gp., LLC*, 787 F. Supp. 2d 1140, 1144 (D. Nev. 2011), ("[A] defendant waives objection to personal jurisdiction and venue when he agrees to a contractual forum selection clause."), *disagreed with on other grounds*, *Del Webb Communities, Inc. v. Partington*, 652 F.3d 1145 (9th Cir. 2011); *Koninklijke Philips Elecs. v. Dig. Works, Inc.*, 358 F. Supp. 2d 328, 333 (S.D.N.Y. 2005) ("While it is true that a choice-of-law provision is not, on its own, sufficient to convey personal jurisdiction over a defendant, the same cannot be said of a forum selection clause."); *Smith Cookie Co. v. Archway Cookies*, 2003 WL 23960710, at \*3 (D. Or. Apr. 23, 2003) (holding that defendant consented to jurisdiction when it agreed to the following clause: "the exclusive venue and jurisdiction for any future litigation initiated by either party at any time prior to [February 28, 2003] . . . . will ile [*sic*] with the United States District Court for the District of Oregon" (alterations in original) (internal quotation marks omitted)); *Inso Corp. v. Dekotec Handelsges, mbH*, 999 F. Supp. 165, 166–67 (D. Mass. 1998) (holding that defendant consented to personal jurisdiction when it agreed to the following clause: "This Agreement shall be deemed a contract made and performed in Massachusetts, shall be construed and governed by the laws of Massachusetts and shall bind the parties, their successors and permitted assigns. The parties stipulate that the proper forum, venue and court for any legal action arising from or in connection with this Agreement shall be the state courts of the Commonwealth of Massachusetts for Suffolk County or the United States District Court for the District of Massachusetts. The licensee agrees that it will not commence any action against [the plaintiff] except in such courts" (internal quotation marks omitted)); *Hanson Eng'rs Inc. v. UNECO, Inc.*, 64 F. Supp. 2d 797, 798 (C.D. Ill. 1997) (holding that defendant consented to personal jurisdiction when it agreed to the following clause: "[I]f the parties cannot agree upon an amicable settlement, then all disputes and differences are to be submitted to the United States District Court of that District, [*sic*] where plaintiff is located" (internal

23

this conclusion, some decisions have cited an observation by the Supreme Court of the United States that "stipulat[ing] in advance to submit . . . controversies for resolution within a particular jurisdiction" is sufficient to establish consent to personal jurisdiction in that forum.[8]

---

quotation marks omitted)); *MCNIC Oil & Gas Co. v. IBEX Res. Co.*, 23 F. Supp. 2d 729, 732 (E.D. Mich. 1998) (recognizing personal jurisdiction where forum selection clause "provide[d] that Michigan law will govern said agreements and that all litigation related to the agreements will be brought in a court located in Michigan"); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Worley*, 690 N.Y.S.2d 57, 59 (N.Y. App. Div. 1999) (explaining that "by agreeing to the forum selection clause in the indemnity agreement, defendant specifically consented to personal jurisdiction over her in the courts of New York and thereby waived any basis to dispute New York's jurisdiction" where forum selection clause read "any action or proceeding of any kind against the undersigned arising out of or by reason of this Indemnification and Pledge Agreement may be brought in any state or federal court of competent jurisdiction in and of the County and State of New York, in addition to any other court in which such action might properly be brought" (internal quotation marks omitted)); *LexisNexis, Div. of RELX, Inc. v. Moreau-Davila*, 95 N.E.3d 674, 677–78 (Ohio Ct. App. 2017) (holding that defendant consented to personal jurisdiction when it agreed to the following clause: "Claims and controversies involving the following will not be subject to arbitration and the parties agree to exclusive jurisdiction in federal or state courts located in Montgomery County, Ohio" (internal quotation marks omitted)), *appeal denied*, 87 N.E.3d 1273 (Ohio 2017); *Vak v. Net Matrix Sols., Inc.*, 442 S.W.3d 553, 556 (Tex. App. 2014) (holding that defendant consented to personal jurisdiction when it agreed to the following clause: "This Agreement shall be governed by and construed under the laws of the state of Texas. The parties agree that this Agreement is made in Harris County, Texas, and that exclusive venue for all litigation arising under or in connection with this Agreement shall be in the courts of Harris County, Texas" (internal quotation marks omitted)).

[8] *Burger King*, 471 U.S. at 472 n.14, 482; *see* 1 Ved P. Nanda et al., LITIGATION OF INTERNATIONAL DISPUTES IN U.S. COURTS § 7:8 (2018); *e.g.*, *Kysar v. Lambert*, 887 P.2d 431, 434, 441 (Wash. Ct. App. 1995) (holding that defendant consented to personal jurisdiction when it agreed to the following clause: "The terms and conditions of the order documents applicable to this transaction shall be interpreted under the case and statutory law of the State of Washington. In the event any action is brought to enforce such terms and conditions, venue shall lie exclusively in Clark County, Washington" (internal quotation marks omitted)), *review denied*, 894 P.2d 564 (Wash. 1995) (TABLE); *see also*

In two decisions, Delaware courts have applied principles of implied consent to hold that when parties specify an exclusive forum for disputes, they implicitly agree to the existence of personal jurisdiction in that forum. In the first decision, an Indonesian company entered into a joint venture agreement with two other companies. *See Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423 (D. Del. 1999). The agreement contained a forum selection clause that stated: "[I]n the event of litigation, the case shall be tried by the appropriate courts in the State of Delaware." *Id.* at 432 (internal quotation marks omitted). When the plaintiffs filed suit, the Indonesian company argued that the clause could not establish personal jurisdiction because it "contain[ed] no reference to

---

*Nw. Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 374, 376 (7th Cir. 1990) (Posner, J.) (explaining that forum selection clause that read "Venue, at the Company's option for litigation and/or arbitration, shall be in the County designated on the front page under the description of the Company's address" actually meant: "In the event of litigation or arbitration, the undersigned consents to suit, at Northwestern's option, in Milwaukee County" (internal quotation marks omitted)).

That said, the better practice is for parties to specify that they consent to personal jurisdiction or waive any jurisdictional defenses. *See, e.g.*, 1 Nanda et al., *supra*, §7:8 (2018) ("Forum selection clauses should, in an abundance of caution, specifically note that the parties waive personal jurisdiction defenses to actions filed in the contracted forum."). The additional language is particularly advisable for agreements governed by California law, where decisions have declined to construe contractual provisions waiving venue objections as consenting to the exercise of personal jurisdiction. *See, e.g.*, *Glob. Packaging, Inc. v. Superior Court*, 127 Cal. Rptr. 3d 813, 815, 820 (Cal. Ct. App. 2011). *But see Frey & Horgan Corp. v. Superior Court*, 55 P.2d 203, 203 (Cal. 1936) (holding that a clause designating California as the exclusive forum for arbitrated disputes constituted consent to jurisdiction in California); *Berard Constr. Co. v. Mun. Court*, 122 Cal. Rptr. 825, 832 (Cal. Ct. App. 1975) (relying on *Frey*), *superseded on other grounds by statute*, Cal. Civ. Code § 1717, *as recognized in In re Marriage of Perow & Uzelac*, 2019 WL 395735 (Cal. Ct. App. Jan. 31, 2019).

jurisdiction." *Id.* The United States District Court for the District of Delaware disagreed, explaining:

> Since the parties have asserted that the purpose of the clause was to provide a forum in the event of litigation, then the parties must have also intended the clause to be an agreement as to personal jurisdiction so that any lawsuit could be maintained in the Delaware forum. Any other interpretation would render the clause senseless because no litigation could proceed without a court having personal jurisdiction over the parties.

*Id.* The court recognized that when the parties involved in crafting an exclusive-forum provision agree to a particular forum, they consent implicitly to the existence of personal jurisdiction in that forum.

In the second decision, an entity formed under the laws of Puerto Rico (Duke) subcontracted with a Delaware corporation (Alstom) regarding a construction project in Puerto Rico. *Alstom Power Inc. v. Duke/Fluor Daniel Carribbean S.E.*, 2005 WL 407206 (Del. Super. Jan. 31, 2005). The contract stated: "[T]his Contract shall be subject to the law and jurisdiction of the State of Delaware, unless expressly designated otherwise within this Contract." *Id.* at *1 (internal quotation marks omitted). When Alstom sued Duke in Delaware, Duke claimed that the Delaware courts lacked jurisdiction. Duke argued that it had agreed only to bring suit in Delaware, not to be sued in Delaware. The Delaware Superior Court disagreed: By agreeing to the forum-selection provision, Duke had consented implicitly to be sued in Delaware. *Id.* at *2–3.

In this case, the plaintiffs argue that Parent consented to the exercise of jurisdiction by Delaware courts when its representatives on the Board adopted the Forum-Selection Bylaw. The plaintiffs do not identify any other basis for asserting jurisdiction over Parent,

26

so this decision only considers the bylaw theory. *But see Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 960 & n.133 (Del. Ch. 2013) (Strine, C.) (explaining that there are "multiple tools that exist to allow the courts of the state of incorporation to hold parties accountable to stockholders claiming that their rights were violated," including theories of aiding and abetting or conspiracy).

The Forum-Selection Bylaw selects the Delaware Court of Chancery as the exclusive forum for particular types of litigation. The language of the bylaw states:

> Unless the Corporation consents in writing to the selection of an alternative forum, and to the fullest extent permitted by law, the sole and exclusive forum for
>
> (i) any derivative action or proceeding brought on behalf of the Corporation,
>
> (ii) any action asserting a claim of breach of a fiduciary duty owed by any current or former director, officer, other employee or stockholder of the Corporation to the Corporation or the Corporation's stockholders,
>
> (iii) any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law, the Certificate of Incorporation or these Bylaws or as to which the Delaware General Corporation Law confers jurisdiction on the Court of Chancery of the State of Delaware, or
>
> (iv) any action asserting a claim governed by the internal affairs doctrine
>
> shall be the Court of Chancery of the State of Delaware and any state appellate court therefrom within the State of Delaware (or, if the Court of Chancery of the State of Delaware declines to accept jurisdiction over a particular matter, any state or federal court within the State of Delaware).
>
> Any person or entity purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this [bylaw].

Ex. 18 at 38 (formatting added). Its obvious purpose is to channel litigation falling within its scope into the Delaware courts.

Parent correctly observes that the Forum-Selection Bylaw does not contain an explicit reference to personal jurisdiction. Parent interprets the Forum-Selection Bylaw as only binding stockholders who wish to be plaintiffs for purposes of determining where they can file lawsuits. Parent contends that nothing in the Forum-Selection Bylaw waived its own right to dispute the existence of personal jurisdiction in Delaware.

Parent's arguments focus on the dimension of explicit consent. They do not address the concept of implicit consent.

In this case, the facts alleged in the complaint support a finding of implicit consent. The Board adopted the Forum-Selection Bylaw on the same day that the Committee gave its final approval for the Acquisition. It is reasonable to infer that the Board adopted the Forum-Selection Bylaw intending that it would apply to any Delaware law claims that a stockholder plaintiff might bring challenging the Acquisition. The Forum-Selection Bylaw selects the Delaware Court of Chancery as the sole and exclusive forum for "any action asserting a claim of breach of fiduciary duty owed by any . . . stockholder of the Corporation to the Corporation or the Corporation's stockholders." *Id.* Parent, as the controlling stockholder and counterparty in the Acquisition, was the obvious stockholder defendant in any action asserting a claim for breach of fiduciary action. Through its power to select the Parent Directors, Parent designated six of the nine members of the Board. Five of those six were executive officers of Parent or its controlled subsidiaries. Parent also

28

controlled a super-majority of the Company's voting power. If it did not like the Forum-Selection Bylaw, it could amend it using that authority. *Chevron*, 73 A.3d at 954.

In my view, under these facts, Parent consented implicitly to the existence of personal jurisdiction in Delaware when its representatives on the Board participated in the vote to adopt the Forum-Selection Bylaw. This is a case governed by Delaware law in which the State of Delaware has a substantial interest. As the Board necessarily recognized when it adopted the Forum-Selection Bylaw, a case of this nature should be heard in a Delaware court. That includes the dimension of this case that relates to Parent's involvement as the self-interested controller.

Parent argues in response that the Forum-Selection Bylaw cannot be construed to address anything other than forum selection because one of the covered categories of litigation encompasses "any action asserting a claim . . . as to which the Delaware General Corporation Law confers jurisdiction on the Court of Chancery." Ex. 18 at 38. This is an obvious reference to subject matter jurisdiction, not personal jurisdiction. Consistent with that interpretation, the bylaw contemplates the possibility of jurisdiction in "any state or federal court within the State of Delaware" if the Court of Chancery "declines to accept jurisdiction over a particular matter." *Id.* The language in the Forum-Selection Bylaw addresses subject-matter jurisdiction over types of cases, not personal jurisdiction over particular litigants.

In a similar argument, Parent cites the forum-selection bylaw that then-Chancellor Strine construed in *Chevron*, which limited its coverage in all cases "*to the court's having personal jurisdiction over the indispensable parties named as defendants.*" *Chevron*, 73

29

A.3d at 942 (internal quotation marks omitted). Parent makes the obvious points that personal jurisdiction and forum-selection are different things and that a bylaw can address one but not the other. That is true, but it is also true that when a party agrees to a forum-selection provision, the circumstances may imply that the party has consented to jurisdiction. That is the situation in this case. If the language of the Forum-Selection Bylaw had contained the caveat found in the *Chevron* bylaw, then that would have been a factor counseling against implicit consent. But the Forum-Selection Bylaw in this case does not contain that language.

In further reliance on *Chevron*, Parent cites then-Chancellor Strine's comment that it was not unreasonable "to require a plaintiff to bring an internal affairs claim in the courts of the state of incorporation against the numerous corporate defendants who will be indisputably subject to the state's personal jurisdiction, simply because a few other defendants have to be sued elsewhere." *Id.* at 960. Parent correctly infers from this language that a forum-selection bylaw will not automatically confer jurisdiction on all defendants in a case. That point is inarguable, but it is also irrelevant. Parent is not subject to jurisdiction in this court because the Forum-Selection Bylaw encompasses all possible defendants. Parent is subject to jurisdiction in this court because of the particular facts of this case, which involve Parent controlling 78% of the Company's voting power, determining who serves in six of nine board seats, filling five of the six with officers of Parent or its subsidiaries, and benefiting from an exclusive-forum provision that its representatives adopted in conjunction with the Acquisition to channel all breach of

30

fiduciary duty litigation into this court. Those facts support the existence of personal jurisdiction over Parent under a theory of implicit consent.

For similar reasons, Parent cannot defeat the assertion of jurisdiction by pointing to Section 115 of the DGCL, 8 *Del. C.* § 115. That statute properly confirms that despite authorizing the inclusion of forum-selection bylaws in the constitutive documents of a corporation, those provisions operate "consistent with applicable jurisdictional requirements." *Id.* In this case, Parent's control over the Company at the board and stockholder levels, together with the actions taken by Parent's representatives on the Board, satisfy applicable requirements of personal jurisdiction through the mechanism of implicit consent.

More broadly, Parent argues that a forum-selection bylaw cannot confer jurisdiction over a stockholder as a defendant. In the principal authority on which Parent relies, I expressed doubts that a comparable forum-selection bylaw could confer jurisdiction in this court over stockholder defendants who had no other ties to Delaware other than their ownership of shares in a Delaware corporation. *See Edgen Gp. Inc. v. Genoud*, C.A. No. 9055-VCL, at 31–32, 34–35 (Del. Ch. Nov. 5, 2013) (TRANSCRIPT). Longstanding Delaware precedent holds that purchasing or owning shares of stock in a Delaware corporation, standing alone, is not enough to enable a Delaware court to exercise personal jurisdiction over a non-consenting party, even in cases of sole ownership.[9] It is not clear to

---

[9] *See Papendick v. Bosch*, 410 A.2d 148, 151–52 (discussing *Shaffer v. Heitner*, 433 U.S. 186 (1977)); *Fisk Ventures*, *LLC v. Segal*, 2008 WL 1961156, at \*7 & n.20 (Del. Ch. May 7, 2008) ("Mere ownership of a Delaware company does not constitute a sufficient

me that buying or continuing to hold shares in a Delaware corporation with an exclusive-forum provision would constitute a sufficient degree of consent to imbue this court with the power to exercise personal jurisdiction over a stockholder who has no other ties to Delaware and did not otherwise participate in the adoption of the forum-selection clause. A number of scholars have questioned the sufficiency of bylaw-based consent to litigate disputes in Delaware.[10] And while this jurisdiction has followed a different course when considering a plaintiff's choice of forum,[11] it seems to me that the critics' arguments

---

basis for personal jurisdiction."); *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 975 (Del. Ch. 2000) ("[O]wnership of a Delaware corporation is not, without more, a sufficient contact on which to base personal jurisdiction."); *Abajian v. Kennedy*, 1992 WL 8794, at *10 (Del. Ch. Jan. 17, 1992) (Allen, C.) ("Merely purchasing stock in a Delaware corporation does not supply the requisite contacts necessary for jurisdiction in a case of this kind." (citing *Shaffer*, 433 U.S. at 215)).

[10] *See, e.g.*, Helen Hershkoff & Marcel Kahan, *Forum-Selection Provisions in Corporate "Contracts"*, 93 Wash. L. Rev. 265, 280–86 (2018); James D. Cox, *How Understanding the Nature of Corporate Norms Can Prevent Their Destruction by Settlements*, 66 Duke L.J. 501, 507 n.25 (2016); Ann M. Lipton, *Manufactured Consent: The Problem of Arbitration Clauses in Corporate Charters & Bylaws*, 104 Geo. L.J. 583, 585–87, 603–626 (2016); Deborah A. DeMott, *Forum-Selection Bylaws Refracted Through an Agency Lens*, 57 Ariz. L. Rev. 269, 279–282, 287–97 (2015); Lawrence A. Hamermesh, *Consent in Corporate Law*, 70 Bus. Law. 161, 167–73 (2014); *see also* Barbara Black, *Arbitration of Investors' Claims Against Issuers: An Idea Whose Time Has Come?*, 75 L. & Contemp. Probs. 107, 114 (2012) ("The countervailing argument, that merely continuing to hold shares is not the manifestation of assent required under contract law, is also supportable."); *cf.* Faith Stevelman, *Regulatory Competition, Choice of Forum, and Delaware's Stake in Corporate Law*, 34 Del. J. Corp. L. 57, 132–33 (2009) (explaining that "the argument based on consent" through the adoption of a bylaw by a majority of stockholders "is surely less than compelling" and highlighting that "[t]he dubiousness of consent would be infinitely compounded if the company had a controlling shareholder").

[11] *See ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 560 (Del. 2014); *Chevron*, 73 A.3d at 955–58.

potentially carry greater weight for a defendant with no other ties to this forum other than its ownership of shares.

This case, however, provides no opportunity to opine on that interesting question. To reiterate, this case involves the exercise of personal jurisdiction over a non-resident controlling stockholder whose representatives on a Delaware corporation's board of directors comprised a majority of the directors who voted unanimously to adopt a forum-selection provision in conjunction with an insider transaction and who selected the courts of this state for precisely the type of litigation in which Parent would be the principal defendant. In my view, under those circumstances, the controlling stockholder consented implicitly to the existence of personal jurisdiction in this state.

This holding is limited to the facts of this case. This decision does not address whether a Delaware court could assert jurisdiction over a stockholder based solely on a board-adopted forum-selection provision if the stockholder had no other ties to this state. Nor does this decision address other factual permutations involving a controller. For example, it does not consider whether a Delaware court could assert jurisdiction over a controller based solely on a board-adopted forum-selection provision if the controller had a less substantial presence on the corporation's board, or if the controller only was alleged to wield effective control rather than possessing hard, mathematical control. This decision holds only that Parent consented to jurisdiction in Delaware on the facts of this case when the Board adopted the Forum-Selection Bylaw.

33

**B.      The Claim For Breach Of Fiduciary Duty Against The Director Defendants**

The Director Defendants have moved to dismiss the claims against them pursuant to Rule 12(b)(6) for failure to state a claim on which relief can be granted. Assuming for the sake of argument that entire fairness applies and that the complaint generally states a claim under that standard of review, they argue that the complaint does not sufficiently allege that they engaged in culpable conduct.

When considering a motion to dismiss for failure to state a claim, this court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs. *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002). In applying this standard, "dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof." *Id.* (internal quotation marks omitted).

The Directors Defendants accept for purposes of their motion to dismiss that entire fairness is the operative standard of review. The Director Defendants do not meaningfully dispute that it is reasonably conceivable that the complaint states a claim under the entire fairness standard. They rather argue that they were not sufficiently involved in the negotiation or approval of the Acquisition to face potential liability.

A director can avoid liability for an interested transaction by totally abstaining from any participation in the transaction.[12] "Delaware law clearly prescribes that a director who plays no role in the process of deciding whether to approve a challenged transaction cannot be held liable on a claim that the board's decision to approve that transaction was wrongful." *In re Tri-Star Pictures, Inc., Litig.*, 1995 WL 106520, at \*2 (Del. Ch. Mar. 9. 1995). But this is "not an invariable rule."[13]

---

[12] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710–11 (Del. 1983) ("[I]ndividuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations, and *in the absence of . . . the directors' total abstention from any participation in the matter*, this duty is to be exercised in light of what is best for both companies." (emphasis added)); *see Propp v. Sadacca*, 175 A.2d 33, 39 (Del. Ch. 1961) (concluding that a conflicted director was not legally responsible for unfair aspects of the transaction where he "abstained from voting in good faith because he honestly believed that if he were to become involved in consideration of [the transactions], his duties as a director would somehow come in conflict with his own self interest" because it was not "the type of corporate act for which a director may clearly be held liable . . . "), *aff'd in part and rev'd in part on other grounds sub nom. Bennett v. Propp*, 187 A.2d 405 (Del. 1962).

[13] *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 753 (Del. Ch. 2007); *see also Tri-Star Pictures*, 1995 WL 106520, at \*3 ("[N]o *per se* rule unqualifiedly and categorically relieves a director from liability *solely* because that director refrains from voting on the challenged transaction." (emphasis original)); *In re Dairy Mart Convenience Stores, Inc.*, 1999 WL 350473, at \*1 n.2 (explaining that "mere abstinence from a vote does not, in the ordinary course, shield or absolve directors from liability" because "[i]t would hardly seem appropriate for directors, by their own choosing, to decide to abdicate [their affirmative fiduciary] duties by not forming an opinion about a board decision"); Balotti & Finkelstein, *supra*, § 4.16[A] ("Typically, directors who did not attend or participate in the board's deliberations on, or approval of, a transaction will not be held liable for the transaction. But an absent director 'who knowingly accepts a personal benefit flowing from a self-interested transaction and refuses to return it upon demand, can be thought to have ratified the action taken by the board in his absence and, thus, share in the full liability of his fellow directors.'" (footnote omitted) (quoting *Valeant*, 921 A.2d at 753–54)).

35

> One might, for example, imagine a scenario in which certain members of the board of directors conspire with others to formulate a transaction that is later claimed to be wrongful. As part of the conspiracy, those directors then deliberately absent themselves from the directors' meeting at which the proposal is to be voted upon, specifically to shield themselves from any exposure to liability. In such circumstances it is highly unlikely that those directors' "nonvote" would be accorded exculpatory significance.

*Tri-Star Pictures*, 1995 WL 106520, at *3. "Similarly, an absent director . . . who knowingly accepts a personal benefit flowing from a self-interested transaction and refuses to return it upon demand, can be thought to have ratified the action taken by the board in his absence and, thus, share in the full liability of his fellow directors." *Valeant*, 921 A.2d at 753–54; *see also In re Oracle Corp. Deriv. Litig.*, 2018 WL 1381331, at *21 (Del. Ch. Mar. 19, 2018). Or a court might hold a director liable, even if the director abstained from the formal vote to approve the transaction, if the director was "closely involved with the challenged [transaction] from the very beginning" and the transaction was rendered unfair "based, in large part," on the director's involvement. *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1166 n.202 (Del. Ch. 2006). More generally, this court may hold an absent director liable if the director "play[ed] a role in the negotiation, structuring, or approval of the proposal."[14]

---

[14] *Valeant*, 921 A.2d at 753; *see In re Ebix, Inc. S'holder Litig.*, 2018 WL 3545046, at *12 (Del. Ch. Jul. 17, 2018); *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *38 (Del. Ch. Apr. 14, 2017, revised Apr. 24, 2017); *see also Cambridge Ret. Sys. v. DeCarlo*, C.A. No. 10879-CB, at 44–48 (Del. Ch. June 16, 2016) (TRANSCRIPT) (explaining that plaintiffs alleged sufficient participation by a conflicted director where complaint stated the director attended a meeting where the board of directors failed to fully consider a decision and another meeting where the special committee approved an apparently "prebaked" deal).

Given the factual nuances underlying this rule, it is no surprise that the leading cases have not addressed the issue at the pleadings stage, but rather in post-trial rulings or on a motion for summary judgment.[15] This decision concludes that the complaint pleads sufficient facts to implicate the Director Defendants in the negotiation, structuring, or approval of the Acquisition.

Nogueira did more than simply vote on the resolution to approve the transaction for purposes of the Indenture. At the outset of the process, Nogueira participated in substantive discussions with Batista over the pricing of the Acquisition, reaching alignment on a price of $1.3 billion. Nogueira then conveyed the substance of the discussions to Lovette and handed off the baton to him. The price that Nogueira initially discussed with Batista and passed along to Lovette was adopted by Barclays for its initial presentation and ultimately became the headline price for the transaction. It also appears that Nogueira may have tried to keep his involvement secret, because the Committee did not learn about Nogueira's discussions with Batista until one month into the negotiations, when the Company's outside counsel disclosed the information to Paul Weiss. At the pleading stage, the allegations of Nogueira's involvement are sufficient to preclude dismissal.

Lovette also did significantly more than just vote on the resolution to approve the transaction for purposes of the Indenture. He received word about the transaction from

---

[15] *See Weinberger*, 457 A.2d at 710–11 (post-trial); *Emerald P'rs v. Berlin*, 2001 WL 115340, at *19–20 (Del. Ch. Feb. 7, 2001) (post-trial), *rev'd on other grounds*, 787 A.2d 85 (Del. 2001); *Tri-Star*, 1995 WL 106520, at *1 (summary judgment); *Citron v. E.I. Du Pont de Nemours & Co.*, 584 A.2d 490, 492 (Del. Ch. 1990) (post-trial).

Nogueira, then pitched the deal to the independent directors. For assistance, he retained Barclays, a financial advisor with substantial ties to Parent. After the Board established the Committee, Lovette routinely attended their meetings and consistently recommended proceeding with the Acquisition. When the Committee considered not bidding further against strategic acquirers as part of a multi-party process, Lovette advocated strongly in favor of the Acquisition. When Parent breached its exclusivity agreement with the Company, Lovette advised the Committee to address the matter "in a constructive manner." Ex. 10 at 4. During the back-and-forth with Parent over the deal terms, Parent frequently dealt with Lovette. And when the Committee sought financing, Lovette negotiated the key terms with Barclays. At the pleading stage, the allegations of Lovette's involvement are more than sufficient to preclude dismissal.

The allegations against the other three Director Defendants—Farahat, Molina, and Tomazoni—are comparably slim. The only action cited in the complaint is their participation in the Board's decision to approve the Acquisition for purposes of the Indenture. In taking this action, the directors arguably violated an earlier Board resolution in which the Board determined not to approve the transaction before the Committee.

The complaint alleges, and it is reasonably conceivable, that if the Director Defendants had not approved the resolution, then the covenant violation would have resulted in harm to the Company. The plaintiffs argue that the Director Defendants therefore had the ability to halt the Acquisition by refusing to approve the resolution. The plaintiffs reason that because the Director Defendants did not stop a transaction that the complaint pleads was unfair, they can be held liable as interested fiduciaries.

The allegations regarding the nature of the remaining Director Defendants' involvement in the approval of the Acquisition support competing inferences. At the pleading stage, it is not possible to select between competing inferences. The plaintiffs receive the benefit of the doubt. It is reasonably conceivable that by approving the resolution, the Director Defendants facilitated the Acquisition and participated in its effectuation. They accordingly cannot obtain dismissal at the pleading stage.

## III. CONCLUSION

The motions to dismiss are denied. Within fourteen days, the parties shall submit a schedule to bring this case to trial.